[Crim. No. 43933. Second Dist., Div. One. July 25, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ALPHONSO JACOBS, Defendant and Appellant.

742

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court Appeal, Jonathan B. Steiner, Chief Assistant State Public Defender, Edward H. Schulman, Diane M. L. Tan and Patricia L. Reber, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., William R. Weisman and Susanne C. Wylie, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**DALSIMER, J.**—Appellant, Alphonso Jacobs, was convicted of one count of forcible oral copulation, one count of rape, and one count of burglary.

The jury found that appellant was armed with a knife at the time the sex crimes were committed.

Ms. P. testified that on June 17, 1982, she and her boyfriend had a quarrel about money. Just minutes after her boyfriend left her motel room with his belongings as a result of the argument, appellant knocked on the door and asked Ms. P. to let him in the room. Ms. P. opened the door slightly, and appellant forced his way into the room, grabbed Ms. P. around the neck, and held a knife pointed at the side of her neck. Ms. P. screamed as loudly as she could, and appellant ordered her to be quiet. Appellant put the knife down and ordered Ms. P. to orally copulate him, and she complied.

After the oral copulation, appellant forced Ms. P. to engage in sexual intercourse with him. During the sexual intercourse, Ms. P. asked appellant if he had any money and if he "get[s] high." Ms. P. testified that throughout the oral copulation and sexual intercourse her baby was asleep on the same bed upon which the acts took place. Ms. P. testified that she and her boyfriend were unemployed, that they were living at the motel with her baby, and that she was paying $180 rent every two weeks.

While appellant was getting dressed after the sexual activities, Ms. P.'s boyfriend knocked on the door. Ms. P. testified that she wanted to open the door, but appellant told her to wait until he had finished getting dressed and she complied. When she opened the door, Ms. P.'s boyfriend, seeing appellant, asked, "What the fuck is he doing here?" Ms. P. told him that appellant had raped her, and he chased appellant from the motel. A deputy sheriff testified that the motel is located in a high prostitution area.

Appellant's testimony was as follows: As he was crossing the street near Ms. P.'s residence, appellant saw Ms. P. and her boyfriend having a physical fight.[1] After Ms. P.'s boyfriend left, appellant approached her and spoke to her because she looked familiar. Ms. P. invited appellant to enter her motel room and told him that she would not let her boyfriend into the room. When appellant entered the room, he saw a small child sleeping on the bed. Ms. P. placed a blanket on the floor near the bed, put the child on the blanket, and asked appellant to be quiet because the child was asleep.

She sat next to appellant on the bed and asked him if he was employed, whether he had any money, and if he would give her enough money to buy a PCP cigarette. Appellant replied, "I don't know. Will it be worth my

---

[1] Ms. P. had testified on direct examination that, after her boyfriend left her motel room, she had followed him to the front of the building, slapped him on the back, and told him to leave.

time if I did?" Ms. P. answered, "It might be; it's possible." Appellant then said, "Well, why don't you show me." Ms. P. began kissing appellant and soon suggested that he get undressed. Appellant told her that he was nervous because of her fight with her boyfriend, but she promised him that she wouldn't let her boyfriend into the room. Ms. P. orally copulated appellant and then asked him to have sexual intercourse with her.

When her boyfriend knocked on the door, Ms. P. told appellant that the person outside was the manager. Appellant opened the door, recognized Ms. P.'s boyfriend, and left. Ms. P.'s boyfriend followed him and asked him what was happening. Appellant told him to ask Ms. P. Upon hearing that answer, the boyfriend attempted to punch appellant, and a physical fight between them developed. Appellant noticed three male Mexicans running toward him. As they were reaching inside their pockets, he feared that the men were armed, and he fled. Ms. P.'s boyfriend and another man pursued him. As he chased appellant, Ms. P.'s boyfriend threatened to kill him, whereupon appellant hid behind a tool shed where the police apprehended him.

Los Angeles Sheriff's Deputy Frank Plass testified that, as soon as he located appellant, he shone his flashlight on appellant's back and in a loud, authoritative voice ordered him to stand up, turn around, and place his hands high over his head. After appellant turned around, he "bolted out," and Deputy Plass struck him with his flashlight, causing him to fall to the ground. When appellant attempted to get up, Deputy Plass "jumped on his back with both . . . knees [and] knocked the air out of him."

Appellant testified that, as soon as the police arrived at the shed, he was ordered to lie face down on the ground. He further stated that he was then handcuffed and kicked in the ribs and received facial burns from having his face placed against the hood of the police car. When asked whether the arresting officer said anything concerning the officer's conclusions regarding appellant's conduct, appellant testified as follows: "Then he started kicking me in the ribs. He said, 'I should kill you nigger. I know you did it. I should kill you right here. That will end the paper work, but that's too good for your black ass. Come on.'"

Deputy Plass and appellant gave conflicting testimony as to whether appellant was armed at the time of his arrest, Deputy Plass insisting that appellant was carrying an open knife, which he ultimately dropped upon command before the police approached him, and appellant denying that he had any weapon.

After the arrest, appellant was taken to a hospital because of the injuries suffered during the course of his arrest. On cross-examination by the pros-

ecution appellant testified as follows concerning his silence in the field at the time of the arrest and later at the hospital: "Q Did he [Deputy Plass] offer you an opportunity to tell your version of what happened? [¶] A No. [¶] Q He didn't take a statement from you; is that right? [¶] A Right. [¶] Q Did you tell him about [Ms. P.'s boyfriend] and his friends or buddies chasing you to that location? [¶] A No. [¶] Q You didn't tell Deputy Plass that you were so relieved to see them [the officers] because you know this mad horde of people were out to kill you? [¶] A No. [¶] Q You didn't tell him that [Ms. P.'s boyfriend] had even threatened to kill you? [¶] A No. I didn't tell him nothing like that. [¶] Q Is that because you thought you might settle things with [Ms. P.'s boyfriend] on your own? [¶] A No. Because when Deputy Plass came on me I was too scared to say anything the way he start whipping on me for nothing, so I had nothing to say but just take the whipping." The record does not indicate whether appellant received warnings under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] previous to remaining silent at the time of his arrest or at the hospital.

Appellant contends that his being questioned concerning his silence violated his due process rights under the United States Constitution and his privilege against self-incrimination under article I, section 15, of the California Constitution. *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] teaches that the use for impeachment purposes of a defendant's postarrest silence after receiving *Miranda* warnings violates the due process clause of the Fourteenth Amendment. (*Id.*, at p. 619 [49 L.Ed.2d at p. 98].) The United States Supreme Court has observed, "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest." (*United States* v. *Hale* (1975) 422 U.S. 171, 180 [45 L.Ed.2d 99, 107, 95 S.Ct. 2133], fn. omitted.)

The potential for prejudice as a result of such questioning is considered so great that, even in the absence of any objection or motion to strike, *Doyle* error may be raised on appeal. (*People* v. *Andrews* (1970) 14 Cal.App.3d 40, 48 [92 Cal.Rptr. 49].) Furthermore, in *People* v. *Galloway* (1979) 100 Cal.App.3d 551 [160 Cal.Rptr. 914], it was observed that CALJIC No. 1.02, which instructs the jury that a question is not evidence and that the jury must "never assume to be true any insinuation suggested by a question asked a witness," will rarely be effective to cure a *Doyle* violation. (*People*

v. *Galloway, supra,* 100 Cal.App.3d at pp. 561-562.) The *Galloway* court explained, "Those cases holding such errors to be harmless have stressed not the presence of curative instructions but the overwhelming evidence of guilt. [Citations.] Other decisions have ruled the error harmless because defendant did not present an exculpatory story that his silence would impeach. [Citations.]" (*Id.,* at p. 562.)

In *Fletcher* v. *Weir* (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309], however, the court held that it does not violate due process for a state to permit cross-examination as to postarrest silence that was not preceded by affirmative assurances such as *Miranda* warnings. (*Id.,* at pp. 605-607 [71 L.Ed.2d at pp. 493-494]; also see *Jenkins* v. *Anderson* (1980) 447 U.S. 231, 238-239 [65 L.Ed.2d 86, 94-95] [impeachment by means of questioning defendant about his prearrest silence does not violate fundamental fairness guaranteed by the Fourteenth Amendment].) Because the record does not indicate whether *Miranda* warnings preceded appellant's silence at the time of his arrest or in the hospital, appellant's federal constitutional argument must fail.

We note that appellant's sole objection below to the challenged line of questioning was an assertion that the questioning exceeded the scope of direct examination. The objection, which was overruled, was made in advance of the specific questions now challenged. ■ While we do not agree that the challenged questions exceeded the scope of direct examination (see *People* v. *Cartwright* (1980) 107 Cal.App.3d 402, 415-416 [166 Cal.Rptr. 37]), appellant's failure to object that the questioning violated his privilege against self-incrimination under the California Constitution does not preclude appellant from raising that contention on appeal. As we have pointed out in our discussion *ante* at page 745, it has been held that, because of the extreme potential for prejudice arising from questions about a defendant's postarrest silence, *Doyle* error may be raised on appeal in the absence of any objection below. (*People* v. *Andrews, supra,* 14 Cal.App.3d 40, 48.) The risk of prejudice is at least as great where, as here, the record does not affirmatively show that *Miranda* warnings preceded the defendant's silence.

■ The issue whether questioning a defendant about his silence during or after his arrest violates the privilege against self-incrimination under California Constitution, article I, section 15, appears to be one of first impression. In a case decided before *Miranda* v. *Arizona, supra,* 384 U.S. 436, the California Supreme Court held that introduction of evidence of a defendant's postarrest silence violates the defendant's privilege against self-incrimination. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 670 [47 Cal.Rptr. 788, 408 P.2d 116], cert. den. (1967) 389 U.S. 1006 [19 L.Ed.2d 604, 88

S.Ct. 568].) The opinion in *Cockrell,* however, made no mention of the privilege against self-incrimination under the California Constitution (Cal. Const., art. I, § 15 [formerly Cal. Const., art. I, § 13]) and appears to be based exclusively on the Fifth Amendment to the United States Constitution.

The privilege against self-incrimination under article I, section 15, of the California Constitution has been held to provide broader protection than that afforded by the Fifth Amendment privilege. In *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272] the court was confronted with the question whether the holding of *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643] that statements obtained in violation of *Miranda* v. *Arizona, supra,* 384 U.S. 436, are admissible for impeachment if voluntary should apply to the privilege against self-incrimination under the California Constitution. Reasoning that "to permit admissibility leaves little or no incentive for police to comply with *Miranda's* requirements" (*People* v. *Disbrow, supra,* 16 Cal.3d at p. 113), the court held that the privilege against self-incrimination of article I, section 15, of the California Constitution precludes prosecutorial use of such statements whether they are sought to be introduced as affirmative evidence or for impeachment. (*People* v. *Disbrow, supra,* 16 Cal.3d at p. 113.) In *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108] the court declined to apply the reasoning of *Michigan* v. *Mosley* (1975) 423 U.S. 96 [46 L.Ed.2d 313, 96 S.Ct. 321] to the privilege against self-incrimination of article I, section 15, of the California Constitution. In *Mosley* the United States Supreme Court had held that, although the defendant had previously refused to speak to police officers after being given *Miranda* warnings, it was not a violation of the Fifth Amendment privilege against self-incrimination to interrogate the defendant after readvising him of his *Miranda* rights two hours later because the defendant's right to cut off questioning was " 'scrupulously honored.' " (*Michigan* v. *Mosley, supra,* 423 U.S. at p. 104 [46 L.Ed.2d at p. 321], fn. omitted.) The *Pettingill* court held that interrogation initiated by the police after a defendant has exercised the right to remain silent violates the privilege against self-incrimination of article I, section 15, of the California Constitution even if the defendant has first been readvised of his rights under *Miranda* and has agreed to waive them. (*People* v. *Pettingill, supra,* 21 Cal.3d at pp. 242-251.)

In *People* v. *Redmond* (1981) 29 Cal.3d 904 [176 Cal.Rptr. 780, 633 P.2d 976] the court rejected the defendant's contention that prosecutorial comment on the defendant's postarrest silence violated defendant's privilege against self-incrimination under the Fifth Amendment. In *Redmond,* defendant, who had been charged with assault with a deadly weapon, admitted that he held a knife as it entered the victim's body but claimed that the injury was accidental. Approximately two months after the stabbing inci-

dent, defendant, while confined at Santa Rita, told his attorney and fellow inmates that the weapon was in his bedroom. Defendant's mother was called as a witness by defense counsel and testified as to the circumstances of her discovery of the knife. The prosecutor later argued to the jury that the two-month delay in defendant's disclosure of the location of the knife indicated a consciousness of guilt.

The court stated, "When a defendant elects to testify in his own defense a comment on his prior muteness does not necessarily violate his [Fifth Amendment] privilege against self-incrimination. [Citations.] [¶] Moreover, defendant's conduct with reference to the location of the knife hardly reflects his 'silence.' . . . The defense having raised the issue, presumably to negate consciousness of guilt, the evidentiary door was thereby opened and the People were entitled by reasonable cross-examination to develop the circumstances more fully and to argue reasonable inferences therefrom." (*Id.,* at pp. 910-911.)

Unlike the situation in *Redmond* where the appellant, in an attempt to demonstrate lack of consciousness of guilt, asserted that he volunteered the location of the knife, here appellant did not assert that he told Officer Plass that he was hiding from people he believed to be armed, one of whom had just threatened to kill him. Here appellant opened no door to cross-examination about whether he told Officer Plass his reason for hiding behind the shed. The question of defendant's silence was injected into this case solely for what the prosecution thought to be its benefit.

We note that the *Redmond* court also stated, "We have said that when a defendant testifies in his own behalf he thereby waives his self-incrimination privilege under both federal and state Constitutions as to matters within the scope of permissible cross-examination [citations] and that when he denies commission of a crime a defendant thereby renders 'very wide' the permissible scope of his cross-examination. [Citation.] It is entirely proper for a jury, during its deliberations, to consider logical gaps in the defense case . . . . [¶] The Fifth Amendment does not prevent such a result." (*Id.,* at p. 911.) Again, in *Redmond,* unlike the case at bench, the defendant was relying on a postarrest statement made before trial to indicate lack of consciousness of guilt. Accordingly, *Redmond,* the holding of which was expressly based on the Fifth Amendment, does not address the issue whether under California Constitution, article I, section 15, a defendant may be questioned about his silence during or after his arrest when the inference concerning that silence is raised not by the defendant but by the People. In *Redmond* the People used defendant's silence as a shield; here they employed appellant's silence as a sword.

In *People* v. *Free* (1982) 131 Cal.App.3d 155 [182 Cal.Rptr. 259], the court was confronted with the issue whether questioning a defendant about his prearrest silence violates article I, section 15, of the California Constitution. Because of the statement in *People* v. *Redmond, supra,* 29 Cal.3d 904, 910-911, that, when a defendant testifies in his own defense, "a comment on his prior muteness does not necessarily violate his privilege against self-incrimination. . . ." (*ibid.*), the court in *Free* held that the questioning was permissible (*People* v. *Free, supra,* 131 Cal.App.3d at pp. 163-166), but criticized that rule as follows: "There is danger in a rule which requires a defendant to go to the police and tell them that he shot and killed a man, as in this case, in order to avoid his silence being used against him; such impinges on his self-incrimination privilege. [¶] . . . [¶] Admission of prearrest silence weakens the concept that the state should be made to shoulder the entire load of proving its case." (*Id.,* at p. 166, fn. omitted.) After reviewing California cases on the issue whether a defendant may be questioned about his postarrest silence, the court stated, "[W]e distill the following California rule: postarrest silence may not be commented upon if it follows a *Miranda* warning. The same rule may apply if there is no *Miranda* warning in order to foreclose inducement of police to dispense with a *Miranda* advisement where they suspect that the arrestee would refuse to talk anyway or where they know that he will, but manipulate the facts by asking no questions immediately after the arrest, in order to use the defendant's silence against him, later giving a *Miranda* warning in order to secure a statement." (*Id.,* at p. 165; also see *People* v. *Callegri* (1984) 154 Cal.App.3d 856 [202 Cal.Rptr. 109]; see *People* v. *Fondron* (1984) 157 Cal.App.3d 390, 397-398 [204 Cal.Rptr. 457].)

Although Detective Plass and appellant gave conflicting versions of the circumstances attending appellant's apprehension by police, both agree that appellant was immediately arrested when the police arrived at the shed. To permit a jury to construe a defendant's silence upon being arrested as indicating a consciousness of guilt would directly impinge upon the privilege against self-incrimination under California Constitution, article I, section 15. This is especially so where, as here, the arrest, for whatever reason, involved violence against the defendant requiring that he be hospitalized.

In *People* v. *Gaines* (1980) 103 Cal.App.3d 89 [162 Cal.Rptr. 827], disapproved on another point in *People* v. *Nelums* (1982) 31 Cal.3d 355 [182 Cal.Rptr. 515, 644 P.2d 201], it was held that questioning a defendant on cross-examination about his postarrest silence violates the Fifth Amendment privilege against self-incrimination even if the defendant was not advised of his *Miranda* rights. (*Id.,* at pp. 94-96.) (The *Gaines* court did not consider whether the cross-examination violated the defendant's privilege under the California Constitution.) Although, after *Gaines* was decided, *Fletcher* v.

*Weir, supra,* 455 U.S. 603, 605-607 [71 L.Ed.2d 490, 493-494], held that such questioning does not violate the Fifth Amendment privilege against self-incrimination, we are assisted by the analysis of *Gaines* in determining whether such questioning violates the privilege against self-incrimination of California Constitution, article I, section 15. The following observations are particularly apt: " '[S]ilence at the time of arrest may be inherently ambiguous even apart from the effect of *Miranda* warnings' [citation]; and . . . the error does not depend upon previous *Miranda* warnings, but 'lies in the cross-examination on this question [of postarrest silence], thereby implying an inconsistency that the jury might construe as evidence of guilt' [citation]. The evil lies in the 'insoluble ambiguity' of such evidence, which . . . 'is of little probative force' [citation], for these reasons: 'At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. . . . [T]he arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.' " (*People* v. *Gaines, supra,* 103 Cal.App.3d at pp. 94-95; see *People* v. *Fondron, supra,* 157 Cal.App.3d 390, 398.)

We hold that under the circumstances of this case questioning appellant on cross-examination about his silence occurring both during and following his arrest violated appellant's privilege against self-incrimination under California Constitution, article I, section 15.

■ A defendant's right under California Constitution, article I, section 15, not to be questioned on cross-examination about his silence during or after his arrest is unaltered by California Constitution, article I, section 28, subdivision (d). Section 28, subdivision (d), provides in pertinent part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . *Nothing in this section shall affect any existing statutory rule of evidence relating to privilege . . . .*" (Italics supplied.) Evidence Code section 940 is an "existing statutory rule of evidence relating to privilege" within the meaning of California Constitution, article I, section 28, subdivision (d). Evidence Code section 940 provides: "To the extent that such privilege exists *under the Constitution of* the United States or *the State of California,* a person has a privilege to refuse to disclose any matter that may tend to incriminate him." (Italics supplied.) An admission by a defendant that he remained silent during or following his arrest has a strong tendency to incriminate him (see *United States* v. *Hale, supra,* 422 U.S. 171, 180 [45 L.Ed.2d 99, 107]), for, as noted in *Hale,* the jury is likely to assign great weight to the defendant's silence in deciding whether he is guilty of the charged offense.

Evidence Code section 940 is a statutory rule of evidence relating to privilege, the scope of which is determined by the federal and California constitutions. It must be presumed that California Constitution, article I, section 28, subdivision (d), was drafted and approved in light of this provision. (See *Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].)

■  Repeals by implication of constitutional and statutory provisions are disfavored. (See *In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610]; *Winchester* v. *Mabury* (1898) 122 Cal. 522, 527 [55 P. 393]; *State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 823 [164 Cal.Rptr. 739].) They are recognized only when two potentially conflicting laws cannot be harmonized. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) A repeal by implication is particularly disfavored where the provision in question is a basic, long-standing constitutional right such as the privilege against self-incrimination.

Nothing in the report of the legislative analyst or the arguments in favor of Proposition 8 of June 1982 printed in the voters' pamphlet indicates an intent to repeal any portion of Evidence Code section 940 or California Constitution, article I, section 15, or even to abrogate the judicial interpretation those provisions have received. The pertinent portion of the legislative analyst's report reads: "Under current law, certain evidence is not permitted to be presented in a criminal trial or hearing. For example, evidence obtained through unlawful eavesdropping or wiretapping, or through unlawful searches of persons or property, cannot be used in court. This measure generally would allow *most relevant evidence* [italics added] to be presented in criminal cases, subject to such exceptions as the Legislature may in the future enact by a two-thirds vote. The measure could not affect *federal* [italics in original] restrictions on the use of evidence." It is noteworthy that the legislative analyst's report made no mention of the privilege against self-incrimination of California Constitution, article I, section 15, although it mentioned that search and seizure laws would be altered by the proposition. It is also noteworthy that the arguments in favor of Proposition 8 made no mention of California Constitution, article I, section 15.

■  Because the prosecution questioned appellant at trial about his silence during and after the arrest in violation of California Constitution, article I, section 15, the judgment must be reversed unless the error was harmless beyond a reasonable doubt. This was an extremely close case. There is a sharp conflict between the testimony of appellant and Ms. P., and there is a strong probability that the questions asked about appellant's silence during and after the arrest tipped the scales in favor of the prosecution. (See *People*

v. *Bain* (1971) 5 Cal.3d 839, 849 [97 Cal.Rptr. 684, 489 P.2d 564].) The obvious purpose of the questioning was to convey the impression that appellant's explanation was fabricated. In view of Ms. P.'s testimony that, although she screamed as loudly as she could when appellant entered the room, the baby remained asleep on the bed where both sex acts took place, her testimony that she asked appellant during sexual intercourse if he had money and whether he liked to "get high," and her disclosure that she waited until appellant finished dressing before letting her boyfriend into the room, we cannot say that the constitutional error was harmless beyond a reasonable doubt.

For the guidance of the court on retrial, we note that, contrary to appellant's contention, the failure to instruct pursuant to CALJIC No. 17.01 was not error because the People's evidence of oral copulation indicated a continuous course of conduct and appellant testified that there was only one act of oral copulation. (See *People* v. *Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971]; *People* v. *Gonzalez* (1983) 141 Cal.App.3d 786, 791, fn. 5 [190 Cal.Rptr. 554].)

The judgment is reversed. The matter is remanded for a new trial.

Spencer, P. J., concurred.

**LILLIE, J.**, Concurring and Dissenting.—I concur in the judgment but respectfully depart from the court's analysis.

The United States Supreme Court in *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], barred the use against a criminal defendant of his postarrest silence as a violation of due process. This holding was limited in *Fletcher* v. *Weir* (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309], to cases in which an arrestee had been given *Miranda* warnings. The record in *Fletcher,* as in the instant case, failed to disclose if *Miranda* warnings were given prior to defendant's silence; in the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, there is no violation of due process of law for a state to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. (455 U.S. at p. 607 [71 L.Ed.2d at p. 494].) However, the court continued at p. 607: "A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony." The California Evidence Code confers on the trial court the discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of

misleading the jury. (Evid. Code, § 352.) It is in its exercise of this discretion that I find the trial court erroneously allowed cross-examination as to defendant's postarrest silence.

As the majority notes, it has been recognized that silence at the time of arrest may be inherently ambiguous. An arrestee may be exercising his right to remain silent to avoid incriminating himself or another; he may be so intimidated by the hostile atmosphere that he chooses to remain mute; or he may be unable to respond to questions based on the confusing and emotional circumstances surrounding the arrest. (*United States* v. *Hale* (1975) 422 U.S. 171, 177 [45 L.Ed.2d 99, 105, 95 S.Ct. 2133]; see, also, *Doyle* v. *Ohio, supra,* 426 U.S. 610, 617-618 [49 L.Ed.2d 91, 97-98]; *People* v. *Fondron* (1984) 157 Cal.App.3d 390, 398-399 [—Cal.Rptr. —]; *People* v. *Gaines* (1980) 103 Cal.App.3d 89, 94-95 [162 Cal.Rptr. 827], disapproved on other grounds in *People* v. *Nelum* (1982) 31 Cal.3d 355 [182 Cal.Rptr. 515, 644 P.2d 201].) The facts in the instant case present the potential for just such an ambiguous interpretation of defendant's silence. At the time of the arrest defendant was in a neighborhood known for prostitution, he had just engaged in sexual conduct with a woman and was being chased by her boyfriend and several other men. He had witnessed a physical fight between this woman and her boyfriend. The situation was unquestionably volatile, and his place in the drama was not at all clear. When the police officer found him hiding nearby, he admittedly struck him with his flashlight and jumped on his back knocking the air out of him and, according to defendant, hurled racial insults and administered physical blows which required medical treatment.

Under these circumstances, defendant's silence reasonably could have been based on his fear of the officer or a realization that any attempt at explanation would be futile; it may have been an invocation of his right to remain silent. Yet on the other hand, the jury well might infer from this silence that defendant was tacitly admitting his guilt or that his explanation at trial was recently fabricated. There is a serious risk of prejudice from such inference, and the probative value of the ambiguous silence is slight in comparison. "Not only is evidence of silence at the time of arrest generally not very probative of a defendant's credibility, but it also has a significant potential for prejudice. The danger is that the jury is likely to assign much more weight to the defendant's previous silence than is warranted. And permitting the defendant to explain the reasons for his silence is unlikely to overcome the strong negative inference that the jury is likely to draw from the fact that the defendant remained silent at the time of his arrest." (*United States* v. *Hale, supra,* 422 U.S. 171, 180 [45 L.Ed.2d 99, 107]; fn. omitted.)

Defendant asked the trial court to exercise its discretion under section 352, Evidence Code, by objecting to cross-examination concerning his arrest[1] and by a later motion for a mistrial. The trial court overruled the objection and denied the motion, concluding that there was nothing sufficiently prejudicial in that evidence. Given the danger of undue prejudice inherent in this kind of evidence and its questionable probative value, it is my conclusion that under the circumstances, the trial court abused its discretion in permitting cross-examination of defendant regarding his silence during and after his arrest.

Respondent's petition for a hearing by the Supreme Court was denied October 25, 1984. Lucas, J., was of the opinion that the petition should be granted.

---

[1] The objection was also on the ground that the questions were beyond the scope of direct examination. I agree with the majority that the prosecutor's questions did not exceed the scope of direct examination.