[Crim. No. 44676. Second Dist., Div. Seven. Apr. 11, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
CORNELIUS GIVANS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*The entire opinion is certified for publication pursuant to rules 976 and 976.1 of the California Rules of Court with the following exceptions: part 4 of the majority opinion, and part III of the concurring and dissenting opinion.

794

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Therene Powell, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Anderson, Michael Nash and Donald E. De Nicola, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—The main issue in this case is whether the rule of *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], that silence following arrest and a *Miranda*[1] warning cannot be used to impeach the defendant's exculpatory testimony at trial, applies where the *Miranda* warning actually is given by a private security guard who has no duty to give such a warning.[2] (See *In re Deborah C.* (1981) 30 Cal.3d 125, 134 [177 Cal.Rptr. 852, 635 P.2d 446].) We hold the rule is applicable in such a case.[3] As an independent ground for reversal, we agree with the decision in *People* v. *Jacobs* (1984) 158 Cal.App.3d 740 [204 Cal.Rptr. 849] that impeaching the defendant with his postarrest, post-*Miranda* warning silence violates his privilege against self-incrimination under article I, section 15 of the California Constitution.

Other contentions of the defendant are discussed in the unreported portion of this opinion because their resolution does not meet the standards for publication of rule 976 of the California Rules of Court.

### FACTS AND PROCEEDINGS BELOW

Defendant was convicted by a jury of one count of robbery.

The victim, Ms. Zumba, was shopping in a Los Angeles supermarket when she was approached by two men, one Latin, one black. The black man demanded the money Ms. Zumba was carrying in her hand. She refused. The man put his hand under his sweater as if he were carrying a weapon. He then grabbed the money out of Ms. Zumba's hand and left the store.

Ms. Zumba reported the robbery to store employees including Mr. Johnson, an off-duty police officer who was working as a security officer for the market. Johnson remembered that at about the time of the robbery he had seen a black man in the market who fit the description Ms. Zumba gave. Johnson's attention focused on this man because he and a Latin man were walking through the store together seeming to put items at random into their shopping cart.

---

[1] *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

[2] At oral argument, the People conceded this issue. See pages 801-802, *infra*.

[3] In this case the *Miranda* warning was given by an off-duty state college police officer working as a private security guard. We do not address the question whether *In re Deborah C.* applies to off-duty police officers. (See 30 Cal.3d at p. 140 [Bird, C. J. conc.].)

Two days later Johnson was again working at the market with a partner, Kenneth Bailey. Bailey observed two men, a black and a Latin, walking through the store together appearing to be picking items at random and putting them in a shopping cart. The men matched the description of the men involved in the Zumba robbery in appearance and behavior.

Bailey alerted Johnson who went outside the store and watched for the men to leave. Defendant, the black man, exited the store. To Johnson, the defendant appeared to be the man he had observed the day Ms. Zumba was robbed and appeared to match the description of the robber given by Ms. Zumba. Johnson walked up to the defendant and identified himself as a store security officer. He asked defendant to accompany him back into the store in connection with a robbery that had occurred two days before. Defendant agreed to go with Johnson. Johnson took defendant to an upstairs office. Johnson testified at that time defendant was in custody and he was handcuffed before or just after he was taken upstairs.

While Johnson waited with the defendant, Bailey brought Ms. Zumba to the store.

Johnson took the defendant, apparently still handcuffed, downstairs to the market while Bailey took Ms. Zumba by a different route upstairs to the office. From there Ms. Zumba could observe people in the market through a one-way glass. Johnson stood with the defendant in one of the aisles. There were nine or ten other people in that aisle including three other black males. Ms. Zumba identified defendant as the man who had robbed her.

Defendant was brought back upstairs and placed under arrest. Bailey read defendant his *"Miranda* rights."* Defendant was specifically told, "You have the right to remain silent. Anything you say can and will be used against you in a court of law." Defendant said nothing and apparently remained silent up to the point city police arrived and took defendant into custody.

Defendant testified at his trial. He admitted having been in the market at about the time Ms. Zumba was robbed but denied robbing her. He also admitted he had talked with a Latin man in the market shortly before his arrest. According to defendant, the man approached him and offered to sell him $15 worth of food stamps for $10. Defendant gave the man $10 but did not receive the food stamps. Instead, the man told defendant he would meet him at the check-out line with the stamps. When defendant arrived at the check-out area the Latin man was not in sight. Defendant went outside to look for the man and that is when Johnson approached him.

Over defense objections, the prosecutor was allowed to bring out the fact defendant had remained silent after receiving the *Miranda* warning. In particular, it was established defendant did not tell the security guards about the alleged theft of his $10. In closing argument, again over a defense objection, the prosecutor was allowed to argue defendant's silence regarding the Latin man's theft of his money impeached the credibility of this story.

## DISCUSSION

1. *Impeaching Defendant Through His Silence After Arrest and a Miranda Warning Denied Defendant Due Process of Law Under the Fourteenth Amendment.*

■ If Officers Bailey and Johnson had been on-duty police officers instead of private security guards, impeachment of defendant through his silence would clearly have been impermissible. In *Doyle* v. *Ohio, supra,* the Supreme Court held the prosecution's use of the defendant's postarrest, post-*Miranda* warning silence to impeach the credibility of the defendant's exculpatory testimony violated the due process clause of the Fourteenth Amendment.

We do not read *Doyle* as requiring the defendant's silence be government-induced; only that it may have been *Miranda*-induced. Nothing in the *Doyle* opinion itself indicates an intent to limit the rule prohibiting impeachment to cases where a government agency was the source of the *Miranda* warning. The court, in *Doyle,* focused its analysis on the content of the warning, not on who gave it.

"Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. . . .

"Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (426 U.S. at pp. 617-618 [49 L.Ed.2d at pp. 97-98]; citation and fn. omitted.)

The court also quoted from Justice White's concurrence in *United States* v. *Hale* (1975) 422 U.S. 171, 182-183 [45 L.Ed.2d 99, 108, 95 S.Ct. 2133]: "'[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does

not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case.'" (*Id.,* at p. 619 [49 L.Ed.2d at p. 98].

Our conclusion that the focus must be on the assurances and not the assurer is supported by the Supreme Court's subsequent decision in *Fletcher* v. *Weir* (1982) 455 U.S. 603 [71 L.Ed.2d 490, 102 S.Ct. 1309] holding the record must reflect the defendant actually received a *Miranda* warning in order to preclude impeachment based on postarrest silence. The court explained *Doyle* as follows: "While recognizing the importance of cross-examination and of exposing fabricated defenses, we held in *Doyle* v. *Ohio* . . . that *because of the nature of Miranda warnings* it would be a violation of due process to allow comment on the silence which the warnings may well have encouraged. . . .

"The significant difference between the present case and *Doyle* is that the record does not indicate that respondent . . . received *any Miranda* warnings during the period in which he remained silent immediately after his arrest." (*Id.,* at p. 605 [71 L.Ed.2d at p. 493]; italics added.)

It is true the Supreme Court in describing *Doyle* has referred to "government action" and "governmental assurances" inducing the defendant's silence. (See *Jenkins* v. *Anderson* (1980) 447 U.S. 231, 240 [65 L.Ed.2d 86, 95, 100 S.Ct. 2124]; *Fletcher* v. *Weir, supra,* 455 U.S. at p. 606 [71 L.Ed.2d at p. 493].) Those references are merely a description of what happened in *Doyle*. They provide no basis for an interpretation limiting *Doyle* to situations where on-duty police officers give the arrestee the *Miranda* warning. That *Doyle* is not limited to warnings by police officers is apparent from the Court's citation of *Johnson* v. *United States* (1943) 318 U.S. 189 [87 L.Ed. 704, 63 S.Ct. 549] as an analogous case. (426 U.S. at p. 618, fn. 9 [49 L.Ed.2d at p. 98].) In *Johnson,* the Court held the trial judge was not required to allow the defendant who testified at his trial to invoke the privilege against self-incrimination but, once the judge advised the defendant he could assert the privilege, and defendant asserted it, elementary fairness precluded the prosecutor from commenting to the jury on defendant's invocation of the privilege. (318 U.S. at pp. 192, 197 [87 L.Ed. at pp. 709, 711].) While *Johnson* can be viewed as a case of government-induced silence, it stands for the propositions a defendant cannot be impeached on his silence after being advised of the right to remain silent

whether or not such advice was required to be given and whether or not the advisor is a policeman.

If we were to hold *Doyle* is not restricted to police officers but is limited to *Miranda* warnings given by government employees, hair-splitting would result which would have nothing to do with the fundamental fairness that is supposed to attach to court proceedings. As a result, "the decision as to when basic constitutional principles apply will turn on who is paying the officer's salary at the time he [advises] the arrestee." (*In re Deborah C., supra,* 30 Cal.3d at p. 141, [Bird, C. J., conc.].) Or, if a private security guard and a police officer are both present at an arrest, the arrestee's rights would turn on which of them reads the *Miranda* warnings. Moreover, we would be inviting private security personnel to engage in a game of entrapment in which they would read the arrestee the *Miranda* rights for the very purpose of inducing his or her silence in order to enable the prosecutor to use this silence against the defendant at trial. (Cf. *Johnson* v. *United States, supra,* 318 U.S. at p. 197 [87 L.Ed. at p. 711].)

*2. Impeaching Defendant on the Basis of His Postarrest, Post-Miranda Silence Violated His Privilege Against Self Incrimination Under Article I, Section 15 of the California Constitution and Evidence Code Section 940.*

■ As a separate, independent ground for reversal, we hold the use of defendant's silence for purposes of impeaching his trial testimony violated his privilege against self-incrimination guaranteed by article I, section 15 of our state Constitution and incorporated into section 940 of the Evidence Code.[4]

In *People* v. *Jacobs* (1984) 158 Cal.App.3d 740 [204 Cal.Rptr. 849] it was held questioning defendant on cross-examination about his silence occurring both during and after his arrest violated the defendant's privilege against self-incrimination under article I, section 15. (158 Cal.App.3d at p. 750.) ■ ■■■ We believe that decision is supported, if not compelled, by our Supreme Court's opinions in *People* v. *Cockrell* (1965) 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116] and *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272].[5]

---

[4]The question whether article I, section 15 may be invoked to exclude evidence in a criminal proceeding in light of article I, section 28, subdivision (d) was answered in the affirmative in *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 810 [210 Cal.Rptr. 204, 693 P.2d 789].

[5]Defense counsel did not object to the impeaching testimony on the ground its probative value was substantially outweighed by the serious risk of undue prejudice to the defendant. (Evid. Code, § 352.) Therefore, that objection is waived. (*People* v. *Navarro* (1981) 126 Cal.App.3d 785, 795 [179 Cal.Rptr. 118].) But see *People* v. *Jacobs, supra,* 158 Cal.App.3d at pp. 752-754 (Lillie, J. conc.)

### 3. *The Error in Allowing the Impeachment Testimony Was Prejudicial.*

■ At the oral argument of this appeal the People conceded *Doyle* applied to this case and rendered inadmissible appellant's silence *after* the security guard gave the *Miranda* warning. However, the People then argued the prosecutor was entitled to comment on defendant's *prearrest* silence. Therefore, there was no prejudice because defendant was silent both before and after his arrest.

■ We agree prearrest silence can be used to impeach the defendant's trial testimony unless the court finds the silence was an invocation of Fifth Amendment rights. (*Jenkins* v. *Anderson, supra,* 447 U.S. 231; *People* v. *Free* (1982) 131 Cal.App.3d 155 [182 Cal.Rptr. 259]; and see *People* v. *Preston* (1973) 9 Cal.3d 308 [107 Cal.Rptr. 300, 508 P.2d 300]; *People* v. *Wilson* (1965) 238 Cal.App.2d 447 [48 Cal.Rptr. 55].) Moreover, there is no basis in the record of this case for an inference defendant's prearrest silence was intended as an invocation of his privilege against self-incrimination. ■ We disagree, however, with the argument defendant was not prejudiced by references to his postarrest silence.

On cross-examination defendant was asked why he did not tell Johnson or Bailey or Officer Ramirez about the Latin man stealing his $10. This question was asked in various ways at least 11 times. (See dissent, *post,* at p. 808, fns. 2 and 3.) Sometimes the question referred to his prearrest silence. Sometimes the question referred to his postarrest silence. Sometimes the time frame of the question was ambiguous. In addition, Johnson and Bailey were asked if defendant had "ever" reported to them the alleged theft of his $10. They both responded he had not.[6] More important, the prosecutor argued to the jury if the defendant was truly innocent he would have ignored the *Miranda* warning and told his side of the story to the security officers or Officer Ramirez. This is exactly the sort of argument *Doyle* was intended to prohibit. (See quotation from *United States* v. *Hale, supra,* at p. 7.)

The applicable test for prejudice in this case is whether these errors were harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Galloway* (1979) 100 Cal.App.3d 551, 559 [160 Cal.Rptr. 914].) Upon an examination of the entire record, it appears reasonably possible

---

[6]We disagree with the dissent's approach to the question of prejudice which is to try to count the number of questions relating to prearrest silence and the number relating to postarrest silence. This is like counting the trees and ignoring the forest. Furthermore, as we noted above, the exact species of some of the trees is in doubt.

these errors may have materially influenced the jury in arriving at its verdict.

The evidence against defendant was not overwhelming. It was based almost entirely on Ms. Zumba's identification of defendant. This identification is suspect given the circumstances under which it occurred. Defendant was placed in an aisle of the market alongside Johnson whom Ms. Zumba knew to be a security officer employed by the market. It appears from the record defendant was handcuffed at this time. The record does not reflect how far away Ms. Zumba was from the defendant when she made her identification but it does show she was in an upstairs office looking down through a one-way mirror. She could not have been very close.

The impeachment of defendant touched a "live nerve in the defense." (*People* v. *Galloway, supra,* 100 Cal.App.3d at p. 561.) The testimony about defendant's silence and the prosecutor's remarks to the jury were intended to challenge the credibility of the one exculpatory defense presented by the defendant. The sole purpose was to convey the impression defendant's explanation was fabricated. (Cf. *Galloway, supra,* at p. 561; *Jacobs, supra,* 158 Cal.App.3d at p. 752.)

The harmful impact of the prosecutor's conduct was not ameliorated by a curative instruction from the trial court. To the contrary, the trial court overruled defense objections to the testimony and closing argument and actively condoned the abridgment of defendant's constitutional rights.

*4. The Trial Court Erred in Prohibiting Defendant's Counsel From Comparing the Defendant's Lineup to Usual Live and Photo Lineups.**

. . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed. The matter is remanded for a new trial consistent with the views expressed herein.

Thompson, J., concurred.

LILLIE, P. J.—I would affirm the judgment. I respectfully dissent from those portions of the majority opinion holding that *Doyle* v. *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240] governs here, and thus the

---

*See footnote, *ante,* page 793.

trial court committed reversible error in allowing defendant's silence to be used for impeachment; and that error was committed in prohibiting defense counsel from comparing the identification procedure with live and photo lineups ordinarily conducted by police. In all other respects I concur.

I agree that had Kenneth Bailey in his capacity as a police officer given the *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) warnings to defendant, *Doyle* would control. But it is undisputed that David Johnson, who detained defendant, and Bailey, who arrested him and read the *Miranda* rights, acted solely in the capacity of private security personnel for Safeway without police cooperation; thus it is my view that the use of evidence of defendant's silence for impeachment was proper.

The evidence falls into two categories. The first relates to defendant's prearrest silence—his failure to tell Johnson, a private security officer for Safeway who detained him, that he had just been the victim of a food stamp scam in Safeway. This evidence is clearly admissible. (See *In re Deborah C.* (1981) 30 Cal.3d 125, 134 [177 Cal.Rptr. 852, 635 P.2d 446].) According to defendant, the reason for his silence was that "everything happened so fast" and "Mr. Johnson did all the talking" while waiting for Mrs. Zumba. The second relates to defendant's postarrest silence—his failure to tell Bailey that he had just been victimized by a Mexican male in a food stamp scam. This silence occurred after Bailey arrested him and read the *Miranda* warnings. For the following reasons, it is my conclusion that this too was admissible.

I

USE OF DEFENDANT'S POSTARREST
SILENCE PROPER

Private security personnel are not police and have only the powers and privileges of other private persons, except as provided by statute. (*People v. Zelinski* (1979) 24 Cal.3d 357, 365 [155 Cal.Rptr. 575, 594 P.2d 1000].) A plainclothes private security employee who acts without police cooperation is not required to follow *Miranda* procedures before eliciting incriminating statements for use against defendant. (*In re Deborah C., supra,* 30 Cal.3d 125, 134.) The confession of Deborah C., given to a private security officer who arrested her for shoplifting but did not advise her of her *Miranda* rights, was admissible on the issue of her guilt. Although in *Deborah C.,* *Miranda* warnings were not given, and in the instant case they were, the language in *Deborah C.* strongly suggests that it *does* make a difference whether the officer who detains and warns a suspect of *Miranda* rights is a

government law enforcement officer or private security personnel. The court in *Deborah C.* pointed up this difference in its reference to *Miranda:* "Does *Miranda* govern custodial investigations by store detectives? That case concerned 'the police' and 'the authorities.' California courts have limited its requirements [citation], to 'law enforcement officials,' and their agents, and agents of the court, while the suspect is in official custody. [Citations.]" (P. 130.) While, as asserted by the majority, nothing in *Doyle* limits the rule prohibiting impeachment to cases where silence is government induced, there is no reason under the *Doyle* facts why it should. But an analysis of *Doyle* and subsequent references to *Doyle* made by the Supreme Court put it in proper perspective. As in *Miranda,* upon which *Doyle* relies, the *Doyle* defendants were advised of their *Miranda* rights by a government officer; in *Doyle* by "a narcotic agent." And the court's subsequent characterization of *Doyle* makes it clear that *Doyle* dealt solely with government action. "In *Jenkins* [*Jenkins* v. *Anderson* (1980) 447 U.S. 231 (65 L.Ed.2d 86, 100 S.Ct. 2124)], as in other post-*Doyle* cases, we have consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him." (*Fletcher* v. *Weir* (1982) 455 U.S. 603, 606 [71 L.Ed.2d 490, 494, 102 S.Ct. 1309].) Finally, in *Deborah C.* the court said: "For policy reasons *Miranda* established a stricter definition of voluntariness when answers are obtained in an 'official interrogation' of a suspect in police custody by 'law enforcement officials' or with their complicity. [Citations.] That private security guards sometimes act under color of law when they conduct illegal searches neither makes them 'law enforcement officials' nor establishes the complicity of those officials for purposes of *Miranda.* It does not render their detention of shoplifting suspects 'police custody' nor their questioning 'official.'" (P. 132.)

## II

### ANY ERROR HARMLESS BEYOND REASONABLE DOUBT

If it can be said impeachment by use of defendant's postarrest silence[1] was error, it fails to rise to the dignity of reversible error under the most stringent rule of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; see also *People* v. *Galloway* (1979) 100 Cal.App.3d 551, 559-562 [160 Cal.Rptr. 914]. Assessing the evidence as a whole to determine the impact of the impeaching evidence on the jury,

---

[1] There are here two categories of postarrest silence the subject of three impeaching questions—defendant was asked if he told Bailey he had been the victim of a theft in the store, and was asked if he told Officer Ramirez about the theft, and if he discussed "this Latin person" with him. Officer Ramirez took defendant into custody at Safeway.

I could not conclude from the overwhelming evidence of defendant's guilt, the defense offered and the nature of the impeaching evidence, that any error was not harmless beyond a reasonable doubt or that there is a reasonable possibility that the evidence complained of might have contributed to the conviction.

Mrs. Zumba is from El Salvador and speaks only little English. She and her sister went to a supermarket on Sunday, January 16. Mrs. Zumba held four $20 bills in her hand. As she entered she saw and heard a Latin male talking to a black male (identified as defendant), but the only thing she was able to catch was the word "money"; later she again observed them together. While Mrs. Zumba was buying chickens, the Latin male approached her and said in Spanish, "Listen, I'm going to sell you some food stamps for 160"; she refused saying she had only enough money for groceries; he then asked if she gets welfare or food stamps, and she responded in the negative. He returned to defendant, and Mrs. Zumba walked over to her sister. When she returned to the chickens, the Latin male a second time approached Mrs. Zumba about buying food stamps, and again she said "No," whereupon he walked back to defendant. The Latin male then walked about while defendant walked over to Mrs. Zumba; he told her, "Give me the money," and when she said "No," he put his hand under his sweater and pointed something at her, which she "thought could be a knife or a gun," and with the other hand grabbed the money from her hand; she pulled her hand away and said " 'Give me my money,' " but he left taking "large steps." Mrs. Zumba was "very frightened" but did not scream or follow defendant; instead she went to her sister who scolded her. She and her sister left the store crying; employees of the store called police. In the store, defendant and the Latin male were in Mrs. Zumba's view "[a]bout 20 minutes."

At trial Mrs. Zumba positively identified defendant as the "black man" who robbed her. Later she described defendant from memory without looking at him, "Kinky hair with an afro-like hairstyle, some black glasses, an oval shaped face, dark, he had a sleeveless brown sweater, a green shirt, brown trousers, slim, not very tall and not very short" but taller than she (she is five feet). She described the Latin male as a little taller than she, brown hair, oval face, very fair, hazel eyes, brown sweater with a blue stripe across the chest, and a tattoo on the back of his hand.

David Johnson is a police officer for the City of Monterey Park but was working the shoplifting detail in civilian clothes as a private security officer on a part-time basis for Safeway on Sunday, January 16; he was on the second floor looking through a two-way mirror when he saw a Latin male and a black male going through the store and at random putting items into a cart without looking at them; he watched them for ten minutes until his

attention was directed elsewhere; four or five minutes later he was advised of an incident in the store, and met Mrs. Zumba outside. She was crying and very upset, but through an interpreter described the two men who had approached her; her description conformed to that of the black male and the Latin male he had just been observing; police were called.

Mrs. Zumba described defendant to police as being taller than she, having kinky hair with an afro and an oval face, and wearing black glasses, a sleeveless brown sweater, green shirt and brown trousers.

Two days later, on January 18, Kenneth Bailey, a police officer for the Los Angeles Community College District, was working part-time with Johnson as a private security officer for Safeway; he observed a Latin male and a black male (defendant), whose descriptions conformed to those in a report of a robbery which had occurred in the store on the 16th, and made contact with Johnson; meanwhile the Latin man and defendant split up and he lost sight of the Latin male but watched defendant put items in a shopping cart at random; he and Johnson then stationed themselves outside to wait for the men to leave; they did not see the Latin male but in about three minutes defendant, who left a cart full of groceries in the produce section, exited the market. Johnson recognized defendant as conforming to the description he had received from Mrs. Zumba and also as the man he had seen in the store on January 16; they approached defendant and identified themselves as private security officers and asked him if he would step back into the store with them "for a brief conversation" concerning a robbery that had been committed there two days before; defendant agreed. Johnson explained to defendant a lady was robbed inside the store on Sunday, he fit the description and he remembered seeing him in the store that Sunday. Defendant was somewhat apprehensive, and "we told him we just wanted to detain him for a while . . . to conduct the investigation—find out his name, his age, place of birth." Defendant said "This is defamation of character. I don't know why you are doing this to me, this is how people get sued." They all went upstairs and Bailey called Mrs. Zumba.

Asked by phone if she could identify the black male, Mrs. Zumba told Bailey "That [she] could" but "I don't want him to see me." He drove her to the store, and while Johnson took defendant downstairs, Bailey took Mrs. Zumba upstairs a different route; defendant was taken to an aisle where people were shopping; she looked at those people and when she saw defendant, she started to jump up and down and scream, "That's him. That's him. That's him." He wore the same sweater, the same brown cap, glasses but a different colored shirt, and he was handcuffed. After her identification, Bailey placed defendant under arrest and read to him the *Miranda* warnings.

The defense was that defendant did not live near the Safeway but went there alone on Sunday, January 16, to do some shopping because he was in the area to see someone he thought was responsible for a hit-and-run on his car; he did not rob Mrs. Zumba.

Defendant further testified that on January 18, he returned to the store alone and was approached by a male Mexican who wanted cash for food stamps; he agreed to buy $15 worth for $10 which he gave to the Mexican; he was to meet him at the checkout with $15 worth of groceries, but the man was not there and he began looking for him in the store and outside where he was approached by Johnson, brought back into the store and handcuffed; he left the shopping cart at the check stand. He did not tell Johnson he had just been the victim of a food stamp scam in the store, nor did he tell anyone after his arrest.

I cannot agree that evidence of defendant's postarrest silence "may have materially influenced the jury in arriving at its verdict." First, the jury had before it overwhelming evidence of defendant's guilt. Mrs. Zumba positively identified defendant at trial as the man who grabbed her money. She had more than ample opportunity to and did observe defendant and hear him speak; he was in her continuous view in the Safeway for 20 minutes— she saw him twice conversing with the Latin male, then observed the 2 talk together after each occasion the Latin male approached her, and finally defendant himself approached her and talked with her at short range demanding her money and grabbing it from her hand. Her observation of defendant was long enough and thorough enough to make her description of defendant precise enough for Johnson to identify him as the man he had just observed for 10 minutes on January 16 and to recognize him in the market two days later, and for Bailey, who had not previously seen defendant, to identify him on January 18. The majority labels Mrs. Zumba's identification in the store on January 18 as suspect because defendant was standing handcuffed near Johnson; but the fact is that when Mrs. Zumba spotted him among the shoppers in the aisle of the store she jumped up and down screaming "That's him. That's him. That's him." Her spontaneous conduct demonstrated an emotional reaction upon seeing the man who took her money that was strong evidence of the credibility of her identification.

While Mrs. Zumba's testimony alone was more than sufficient to establish defendant as the robber, her testimony, in large part, was corroborated by Johnson, indeed, by defendant himself. Defendant admitted being in Safeway on January 16; further, just before Johnson talked to Mrs. Zumba on January 16, he watched defendant for 10 minutes with a Latin male fill a cart at random, an obvious ruse to appear to be a bona fide shopper while on the lookout for victims.

Second, the defense to the robbery was brief and to the point—defendant was in Safeway on Sunday but did not rob Mrs. Zumba. Defendant's testimony then developed a food stamp scam in which he claimed a Mexican male victimized him in the Safeway on January 18 just prior to his detention by Johnson. That he was victimized of $10 in the market may explain what he was doing in Safeway on January 18, but does little or nothing for his defense that he did not rob Mrs. Zumba on January 16. While evidence of defendant's silence concerning this purported theft went to his credibility—whether his testimony concerning the food stamp scam by a Mexican male was a recent fabrication—it did not directly impeach his defense to the crime of robbery.

Third, the bulk of the impeaching questions related to defendant's prearrest silence—his failure to tell Johnson he had just been the victim of a theft—and those questions were proper as were the questions of Johnson on rebuttal. Whatever impact the evidence of defendant's silence had on the jury, it occurred long before the few impeaching questions were asked of defendant concerning his silence after arrest. Contrary to the assertion of the majority that there was only one question posed to defendant regarding his prearrest silence, and there were numerous questions referring to his postarrest silence, there appear in the cross-examination of defendant at least eight[2] separate occasions on which he was asked about his *prearrest* silence to Johnson, one of which did also include Bailey, and one, Bailey and Ramirez; but I find no more than three[3] questions later directed to postarrest silence—one relating to his failure to tell Bailey of the theft, and two relating to his silence to Officer Ramirez. Equally limited was the im-

---

[2]By the prosecutor to defendant on cross-examination:

"When you made contact with Mr. Johnson, did you advise him that you had been ripped off, someone had taken your $10?"

"At that time [when detained outside the store] did you tell Mr. Johnson that you had been the victim of a theft yourself inside the store just minutes before?"

"And did you tell Mr. Johnson that you had been the victim of a theft inside the store?"

"Why didn't you tell Mr. Johnson that you yourself had been a victim inside the store?"

"And in that one hour and a half [while waiting for Mrs. Zumba] you didn't convey to Mr. Johnson that you had been the victim of a theft inside the store?"

"Did you tell Mr. Johnson and Mr. Bailey about this Latin person?"

"Well, you had been the victim of a theft, had you not?"

[Answer by defendant]: "I never discussed the problem that happened within at all. Mr. Johnson did all the talking."

"My question is, why didn't you report the fact that you had been victimized inside the store to anyone, Mr. Johnson, Mr. Bailey, Officer Ramirez?"

[3]"Well, Mr. Givans, did you tell Mr. Bailey that you had been the victim of a theft inside the store, too?"

"Mr. Givans, did you ever tell Mr. Ramirez the fact that you had been the victim of a theft inside the store?"

"Did you discuss this Latin person with Mr. Ramirez from the Los Angeles Police Department?"

peaching evidence relating to postarrest silence. Three questions[4] were asked of Johnson on rebuttal relating to prearrest silence, but only one was asked of Bailey,[5] and *none* was asked of Ramirez. The impeaching questions of defendant relating to his prearrest silence were asked first, and consisted of the bulk of the impeaching evidence; it was then the impact was made on the jury. Thus, any subsequent queries relating to postarrest silence, of which there were only several, could have had little or no additional impact on the jurors. Further, defendant explained his postarrest silence to be the result of Bailey's *Miranda* warnings, and admonition, "From this point don't talk to anybody pertaining to anything, no matter who it is."[6]

III

JURY ARGUMENT RE DEFENDANT'S
"LINEUP"*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

I concur in the majority opinion in all other respects.

Respondent's petition for review by the Supreme Court was denied June 27, 1985.

---

[4]On rebuttal, Mr. Johnson was asked by the prosecutor the following questions to which the following answers were given: "Did Mr. Givans ever complain to you that he himself had been the victim of a theft inside the store?
"A. No, he did not.
"Q. Did he ever mention a Latin person?
"A. No, he did not.
"Q. As being involved with on that date?
"A. No, he did not."

[5]Of Mr. Bailey, by the prosecutor, "Did Mr. Givans ever tell you that he himself had been the victim of theft inside the store prior to commencing contact with Mr. Johnson?
"A. No."

[6]While Mr. Bailey on rebuttal testified he read the *Miranda* warnings to defendant, he said he did not give him any further advice about keeping quiet.

*See footnote, *ante,* page 793.