[No. F003271. Fifth Dist. Apr. 10, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL F. BARRIOS, Defendant and Appellant.

**COUNSEL**

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Mark L. Christiansen, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, James T. McNally and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOOLPERT, J.**—In April of 1983 defendant was charged with violation of Penal Code section 187 (murder). It was also alleged that defendant had used a firearm, within the meaning of section 12022.5, during the commission of the crime. Defendant pled not guilty.

A nine-day jury trial followed in August. After the jury was selected, defendant made a motion to bar use of his postarrest statements to police. He objected to their use in the prosecution's case-in-chief or for impeachment. The motion was denied. The jury found defendant guilty of first degree murder. The firearm use allegation was found to be true.

Defendant has been sentenced to prison for a term of 27 years to life. He appeals.

### THE FACTS

On February 19, 1983, defendant shot and killed his brother-in-law, Raphael Cardona, in a bar in Porterville. Cardona had been married to defendant's sister, Theresa.

According to the victim's companion, Mario Gonzales, he and Cardona had gone to Porterville with the hope of finding work in the fields and as musicians. They arrived in town on the day of the murder. They went to a house where defendant's parents lived and spoke with Theresa and her parents. They were served dinner while they were there. They left after dinner in order to go to the Frontier Bar, where Cardona and Gonzales hoped to play music for money.

Defendant's sister testified that Cardona also wanted to see their children and was hoping to reunite with her when he came to Porterville. She, too, wanted the family back together, even though the original cause for their separation was the fact that Cardona hit her. She described the hitting as

being with his closed fist. He had also threatened her with a knife. She testified that Cardona usually carried a knife and had once carried a gun.

Defendant knew Cardona hit his sister and threatened her in the past. In addition, Theresa told defendant that Cardona usually carried a knife and that he had once threatened to kill her. While at trial she could not recall telling defendant that Cardona carried a gun in addition to a knife, she did testify to that fact at defendant's preliminary hearing. She described Cardona as having a quick temper and being a person who would become angry for no reason. Defendant apparently saw Cardona slap his sister on one occasion in Porterville, and told him not to hit her. Cardona responded angrily by telling defendant to, in effect, mind his own business.

Defendant arrived at his parents' home after Cardona had left for the Frontier Bar. He learned of Cardona's visit and asked where to find him. He was not told specifically where he had gone, although he was told that Cardona had gone to work.

Defendant left with friends. They stopped at a bar, and discovering that no music was being played there, proceeded to the Frontier Bar. At this time, Cardona had been at the bar long enough to play approximately five songs.

According to Gonzales, Cardona had just finished a song and had another to play when defendant arrived. Defendant approached Cardona, who was holding his accordion, and offered to pay for a song to be played. Cardona said he had a previous request to fill.

Defendant testified that he then asked Cardona about his intentions concerning his sister. He said Cardona became angry, threatened him, and reached behind his accordion with his right hand as he stepped backwards. Defendant thought Cardona was reaching for a gun. At this point, defendant drew his gun and fired. He could not recall how many times he fired. He denied intending to kill him.

Gonzales testified Cardona's hands were on the accordion just prior to the shooting. And although a knife was found in Cardona's front left pocket, no gun was found. The knife was a folding knife with a five-inch blade.

Defendant fled the bar immediately after the shooting. On his way out, he pointed the gun toward the bar and told the patrons not to move. There was also testimony that he threatened to "burn" anyone who moved.

Defendant arrived at the Mirola family home later that evening. He pointed a gun at Mirola, told him he had killed someone, and asked him to take

him to Mexico. Mirola said the trip would be impossible because he had no money and his car did not run. Defendant then removed the gun from his waistband and asked to talk to Mirola's father. Defendant also told Mirola's father he had just killed someone and that he wanted to go to Mexico.

Later, Mirola informed the officers of what had happened. Defendant was arrested a short time later in a car in front of the Mirola house. Upon arrest, a gun was found in defendant's possession. The gun was later positively identified as the weapon from which three of the bullets in the victim's body had been fired. Other facts tending to show the gun was the murder weapon were overwhelming and are unnecessary to detail here.

There is significant testimony to the fact defendant had been drinking heavily on the evening of the shooting. His blood alcohol level after arrest was 0.17 percent.

Besides Gonzales, the shooting was witnessed by two other people in the bar. According to Mace, Cardona fell after the first few shots. He was then shot in the chest. In contrast, defendant testified that Cardona did not fall until the end of the shooting.

Defendant made incriminating statements to the officer who interviewed him after his arrest. These statements were tape-recorded.

## "PROPOSITION 8" AND THE PRIVILEGE AGAINST SELF-INCRIMINATION

Five issues are raised on this appeal. We discuss only the first one as it requires reversal and new trial.

Defendant was called to testify on his own behalf. We will contrast his direct testimony with the subsequent impeachment which made use of his postarrest statements to an interviewing officer, Martin Espinoza, which were obtained in violation of *Miranda*. It is agreed his privilege not to give evidence against himself was violated at the interview; nevertheless, the statements he made at the interview were admitted to impeach his trial testimony—the theory of admissibility being that they could be used in this restricted fashion.

On direct examination defendant testified that he carried the gun because of Cardona's violent temper and reputation for always being armed:

"Q Why did you think you needed a gun when you were going to tell Rafael these things?

"A Well, I was afraid of it, because he always carried weapons. And he was a marijuana smoker.

"When he was under the influence he was very offensive, under the influence of that stuff.

"Q Did you think he would get angry with you if you talked to him about Theresa?

"A Yes.

"Q Did you think that he would be armed when you met him somewhere in Porterville?

"A Yes, I worked with him for some time and I saw that he carried a gun.

"Q Why did you take the gun with you when you went to the bars to go dancing?

"A Well, it wasn't really to take to the dance. I picked it up because—because I knew at any moment I was going to be meeting up with him, and I wasn't—I was afraid of him."

The contrasting statements defendant made to police during the tape-recorded interview were used in rebuttal. The interviewing officer testified that he made out his report concerning the interview while reviewing the tape recording.

The officer's testimony reviewed statements made by the defendant which, although not a full confession of first degree murder, were tantamount to a confession. The district attorney relied heavily on them to discount the defense, and to bring about a first degree murder conviction. We quote some of the testimony.

"Q Did he tell you that if he took the gun with him it was because he was going to use it?

"A Yes. He said he was, as he put it, he was well prepared.

"Q Okay. Did he tell you actually say the words that if he took it it was because he was going to use it?

"A Yes."

Officer Espinoza also testified that defendant said he knew how many bullets the gun held, and that he knew he had used them all on the victim. He never said he was going to the bars to dance. In fact, there is no dancing at the bar where the shooting took place. Defendant said he did not call the police after the shooting because he did not have any reason to do so.

We now quote some of the district attorney's argument to the jury.

"Next in line with the premeditation and deliberation we have the fact that the defendant told Officer Espinoza the day of the killing or the morning after the killing that he went to the Frontier Club, he went to the bars to look for Rafael Cardona.

"In fact, he got his gun, his loaded gun and he told Officer Espinoza that he never carried a gun, and he carried it on this particular occasion because he was gonna use it.

"If he was gonna carry it, he was gonna use it. He told Officer Espinoza that he was well prepared.

". . . . . . . . . . . . . . . . . . . . . . . .

"Now, ladies and gentlemen, let's go down through the ways that the testimony has shown you that he did not have an hone[s]t belief in self-defense, and that he did not testify truthfully before you.

"The defendant in court when he testified, told you that he was not angry about Rafael Cardona coming over to his place.

"He told you that he wanted Rafael Cardona to stay, to stay with Theres[a], and to stay in Porterville, yet Manuel Barrios has told the police that he was upset at Rafael Cardona, and he felt that Rafael Cardona had humiliated the family, and he didn't want him around.

". . . . . . . . . . . . . . . . . . . . . . .

"Manuel Barrios told you that he wanted to go dancing. After he realized that Rafael had been to the house, he says, well I just want to go to the bars to go dancing.

"I used to be a dancehall director or something to that effect. Manuel Barrios, however, told the police that he wanted to go confront Rafael Cardona, and that if he was gonna carry a gun, it was because he was gonna use it.

"· · · · · · · · · · · · · · · · · · · · · · ·

"Now Manuel Barrios told you in court that he didn't know how many bullets the gun took.

"Yet he told the police that he knew the gun held nine bullets, and he knew he had unloaded all nine of those bullets.

"· · · · · · · · · · · · · · · · · · · · · · ·

"Now, Manuel Barrios told you in court that he didn't go to the police because he was scared.

"Yet he told Officer Espinoza right after the shooting that he didn't go to the police because he didn't have a reason to."

■■■■ As noted, defendant requested the court rule that the postarrest statements to police not be used in the prosecution's case-in-chief or for impeachment. The prosecution agreed these statements would not be used in its case-in-chief. The *Miranda* warnings were apparently invalid in light of *People* v. *Diaz* (1983) 140 Cal.App.3d 813 [189 Cal.Rptr. 784].

Defendant argued the statements should also not be used for impeachment purposes because article I, section 28, of the California Constitution (hereafter Prop. 8) did not alter statutory rules of evidence which relate to privilege. Therefore, usage of the postarrest statements is barred for any purpose under *People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]. This same argument is made on appeal.

The pertinent part of Prop. 8 provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press." (Cal. Const., art. I, § 28, subd. (d).)

In *Disbrow,* the California Supreme Court recognized the rule of *Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], as the federal rule, but held that the California Constitution provided further protections: "We therefore hold that the privilege against self-incrimination of

article I, section 15, of the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny. Accordingly, we overrule *Nudd* and declare that *Harris* is not persuasive authority in any state prosecution in California.

"We are not the first court to reject *Harris* on state constitutional grounds. . . ." (*Disbrow, supra,* 16 Cal.3d at p. 113, fn. omitted.)

The prosecution argued that Prop. 8 mandated application of the federal rule of *Harris,* which allows statements taken in violation of a defendant's *Miranda* rights to be used to impeach the defendant.

"Some comments in the *Miranda* opinion can indeed be read as indicating a bar to use of an uncounseled statement for any purpose, but discussion of that issue was not at all necessary to the Court's holding and cannot be regarded as controlling. *Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (*Harris, supra,* 401 U.S. at p. 224 [28 L.Ed.2d at p. 4].) *Harris* is like the present case in that the defendant was not impeached as to collateral matters: "[P]etitioner here was impeached as to testimony bearing more directly on the crimes charged. . . . Petitioner's testimony in his own behalf concerning the events of January 7 contrasted sharply with what he told the police shortly after his arrest. The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (*Id.,* at p. 225 [28 L.Ed.2d at p. 4].)

Prior to giving its holding, the *Harris* court then stated additional reasons for its rule: "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See *United States* v. *Knox,* 396 U.S. 77 (1969); cf. *Dennis* v. *United States,* 384 U.S. 855 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the

traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment.

"The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements." (*Id.*, at pp. 225-226, fn. omitted [28 L.Ed.2d at pp. 4-5].)

The prosecution further argued that the defendant's reliance on the Evidence Code sections on privilege was incorrect, the purpose of the sections being inapplicable to the facts in the present case. This is an argument with which the court impliedly agreed when ruling the statements could come in under the *Harris* rule.

Evidence Code section 940 provides as follows: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him."

Evidence Code section 930 provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a defendant in a criminal case has a privilege not to be called as a witness and not to testify."

Article I, section 15 of our state Constitution provides, in pertinent part, as follows: "Persons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ."

Defendant's position is squarely supported by the recent case of *People v. Jacobs* (1984) 158 Cal.App.3d 740 [204 Cal.Rptr. 849]. *Jacobs* involved cross-examination by the prosecution about the defendant's postarrest silence, rather than a defendant's improperly *Mirandized* postarrest statements.

The analysis of the court in *Jacobs* is provided below: "A defendant's right under California Constitution, article I, section 15, not to be questioned on cross-examination about his silence during or after his arrest is unaltered by California Constitution, article I, section 28, subdivision (d). Section 28, subdivision (d), provides in pertinent part: 'Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in

any criminal proceeding . . . . *Nothing in this section shall affect any existing statutory rule of evidence relating to privilege* . . . .' (Italics supplied.) Evidence Code section 940 is an 'existing statutory rule of evidence relating to privilege' within the meaning of California Constitution, article I, section 28, subdivision (d). Evidence Code section 940 provides: 'To the extent that such privilege exists *under the Constitution of* the United States or *the State of California,* a person has a privilege to refuse to disclose any matter that may tend to incriminate him.' (Italics supplied.) An admission by a defendant that he remained silent during or following his arrest has a strong tendency to incriminate him (see *United States* v. *Hale, supra,* 422 U.S. 171, 180 [45 L.Ed.2d 99, 106]), for, as noted in *Hale,* the jury is likely to assign great weight to the defendant's silence in deciding whether he is guilty of the charged offense.

"Evidence Code section 940 is a statutory rule of evidence relating to privilege, the scope of which is determined by the federal and California Constitutions. It must be presumed that California Constitution, article I, section 28, subdivision (d), was drafted and approved in light of this provision. (See *Estate of McDill* (1975) 14 Cal.3d 831, 839 [122 Cal.Rptr. 754, 537 P.2d 874].)" *(People* v. *Jacobs, supra,* 158 Cal.App.3d at pp. 750-751.)

■ We conclude the rationale of the *Jacobs* decision is applicable to the present case. Our defendant was not cross-examined as to his postarrest silence, but as to his postarrest statements. In either case, there is a strong tendency for the otherwise barred form of questioning to incriminate the defendant. We further note that the California Supreme Court has denied a petition for hearing in the *Jacobs* case.

■ The comment of the Law Revision Commission lends further support for defendant's argument. The commission expressly stated that Evidence Code section 940 was written in light of the state *and* federal constitutional privileges. Most significantly, the commission further stated that the section did not define the scope of the privilege—a task left to the courts. This statement acknowledges the obvious. *(Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825, 829-830 [134 Cal.Rptr. 130].) The comment is provided below: "Comment. Section 940 recognizes the privilege (derived from the California and United States Constitutions) of a person to refuse, when testifying, to give information that might tend to incriminate him. See *Fross* v. *Wotton,* 3 Cal.2d 384, 44 P.2d 350 (1935); *In re Leavitt,* 174 Cal.App.2d 535, 345 P.2d 75 (1959). This privilege should be distinguished from the privilege stated in Section 930 (privilege of defendant in a criminal case to refuse to testify at all).

"Section 940 does not determine the scope of the privilege against self-incrimination; the scope of the privilege is determined by the pertinent provisions of the California and United States Constitutions as interpreted by the courts. See CAL. CONST., Art. I, § 13. See also *Malloy v. Hogan,* 378 U.S. 1 (1964). Nor does Section 940 prescribe the exceptions to the privilege or indicate when it has been waived. This, too, is determined by the cases interpreting the pertinent provisions of the California and United States Constitutions. For a statement of the scope of the constitutional privilege and some of its exceptions, see *Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Article V. Privileges),* 6 CAL. LAW REVISION COMM'N, REP., REC. & STUDIES 201, 215-218, 343-377 (1964)." (7 Cal.Law Revision Com. Rep. (1965) p. 170; see also Cal.Law Revision Com. com. to Evid. Code, § 940, 29B West's Ann. Evid. Code (1966 ed.) p. 513.)

■■■ The scope of the state constitutional privilege against self-incrimination has been determined by the Supreme Court in *Disbrow* to preclude any use in a criminal proceeding of extrajudicial statements taken in violation of the *Miranda* rights of the defendant in that proceeding. ■■■ And, by its own terms, Prop. 8 does not affect Evidence Code section 940.

The People acknowledge the *Jacobs* opinion and ask this court to disagree with it, urging that *Jacobs* is not the final word on the issue. In so urging, they have set forth an analysis of the legislative history surrounding adoption of Evidence Code section 940.

It is their position, in essence, that the protections provided by the section were not intended to be identical with all of those offered by the constitution. They seek to limit the protections under the statute to those which can be derived from a very literal reading of the section itself. The section would thereby only protect a defendant from incriminating statements he might give while on the witness stand. This would restrict the privilege by making it simply testimonial in nature. Incriminating statements made by the defendant while not on the witness stand could be used to incriminate him, even though those statements were the product of a violation of the defendant's *Miranda* rights.

Evidence Code section 940 was derived from Uniform Rules of Evidence, rule 25. The People find the following language of the Law Revision Commission to be persuasive: "Rules of evidence cannot speak in terms of a privilege not to disclose in those situations where there is no duty to disclose; evidentiary privileges exist only when a person would, but for the exercise of a privilege, be under a duty to speak. For example, such rules are not concerned with inquiries by a police officer regarding a crime nor

with the rights, duties, or privileges that a person may have at the police station. Thus, the *person who refuses to answer a question or accusation by a police officer is not exercising an evidentiary privilege because he is under no legal duty to talk to the police officer. Whether such an accusation and the accused's response thereto are admissible evidence is a separate problem with which Revised Rule 25 does not purport to deal.* See, however, Revised Rule 63(6) (confession or admission of defendant in criminal case) and Revised Rule 62(1) in *Tentative Recommendation and a Study Relating to the Uniform Rules of Evidence (Article VIII. Hearsay Evidence),* 4 CAL. LAW REVISION COMM'N, REP., REC. & STUDIES 301, 319-320, 309 (1963)." (Tent. Recommendation and Study Relating to the Uniform Rules of Evidence, art. V, Privileges (Feb. 1964) 6 Cal.Law Revision Com. Rep. (1964) pp. 216-217, italics added (hereafter Com. Rep. on URE).)

Interpreting the above comments by the commission to mean the drafters intended the privilege represented by Evidence Code section 940 to extend only to testimony at trial is the product of too superficial a reading of the commission's comments. What the language suggests is that if arrested, for example, a defendant should assert his *constitutional* right to remain silent rather than his right under the Evidence Code. By trial, however, a defendant could invoke either the evidentiary privilege or constitutional privilege, the two being synonymous. (See, e.g., Com. Rep. on URE, at p. 216, discussing Proposed Rule 22.5.)

Further support for the conclusion the People's reading is superficial may be found in other parts of this same Law Revision Commission Report.

Below is the rule as originally drafted by the authors of the Uniform Rules of Evidence. The stricken portions of the original rule are those which the California Law Revision Commission was not recommending be included in the new California Rules of Evidence. (Com. Rep. on URE at p. 209.)

"Rule 25. ~~Subject to Rules 23 and 37,~~ Every natural person has a privilege, ~~which he may claim,~~ to refuse to disclose ~~in an action or to a public official of this state or any governmental agency or division thereof~~ any matter that will incriminate him *if he claims the privilege,* except that under this rule~~,~~:

" . . . . . . . . . . . . . . . . . . . . .

"(6) ~~g~~ Subject to Rule 21, a defendant in a criminal ~~action~~ *proceeding* who ~~voluntarily~~ testifies in ~~the action~~ *that proceeding* upon the merits before the trier of fact ~~does not have the privilege to refuse to disclose any matter~~

~~relevant to any issue in the action~~ *may be cross-examined as to all matters about which he was examined in chief.*" (*Id.*, at pp. 215-216, fn. omitted, proposed rule 25, subd. (a).)

In commenting on subdivision 6, the commission stated: "Subdivision (6). Subdivision (g) of the URE rule, now subdivision (6) of the revised rule, has been revised to incorporate the substance of the present California law (Section 1323 of the Penal Code). See *People* v. *McCarthy,* 88 Cal.App.2d 883, 200 P.2d 69 (1948). Subdivision (g) of the URE rule conflicts with Section 13, Article I of the California Constitution as interpreted by the California Supreme Court. See *People* v. *Obrien,* 66 Cal. 602, 6 Pac. 695 (1885). See also *People* v. *Arrighini,* 122 Cal. 121, 54 Pac. 591 (1898)." (*Id.*, at p. 218.)

The cases cited by the commission all deal with the permissible scope of cross-examination of a testifying defendant. The significance of the above comment for purposes of this discussion, however, is that the commission expressed from the outset a desire for the proposed rule to comport with the state Constitution and case law interpreting it.

This view of the intent of the drafters is further evidenced by the commission's introductory paragraph to its comment on the proposed rule in question: "Revised Rule 25 sets forth the privilege, derived from Article I, Section 13 [now article I, section 15] of the California Constitution, of a person when testifying to refuse to give information that might tend to incriminate him. This privilege should be distinguished from the privilege stated in Revised Rule 23, which is the privilege of a defendant in a criminal case to refuse to testify at all. As in the case of Revised Rule 23, *the Commission recommends that the law relating to the privilege against self-incrimination be gathered together and articulated in a statute such as Revised Rule 25.*" (*Id.*, at p. 216, italics added.)

The commission also noted that because privileges tend to exclude evidence from consideration by the trier of fact, they nevertheless exist because legislatures and courts have found them necessary since "it is so important to keep certain information confidential . . . ." (*Id.*, at p. 207.)

In *Disbrow,* the court made similar comments: "[O]ur principal objection to the *Harris-Nudd* rule lies in the considerable potential that a jury even with the benefit of a limiting instruction, will view prior inculpatory statements as substantive evidence of guilt rather than as merely reflecting on the declarant's veracity. . . . [¶] Furthermore, to permit admissibility leaves little or no incentive for police to comply with *Miranda*'s requirements. . . . [¶] In addition to the likelihood that police misconduct may be encour-

aged by *Harris,* we are further convinced of the impropriety of receipt of this evidence by a significant rationale of the exclusionary rule itself. In *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], the landmark case in which this court adopted the rule for California two decades ago, we said, 'the success of the lawless venture depends entirely on the court's lending its aid by allowing the evidence to be introduced. . . . Out of regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such "dirty business." ' In the case at bar, accordingly, exclusion of the statements illegally extracted from defendant by Detective Yost would 'relieve the courts from being compelled to participate in such illegal conduct.' (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 156 [98 Cal.Rptr. 649, 491 P.2d 1].)" *Disbrow, supra,* 16 Cal.3d at pp. 112-113, fn. omitted.)

If we conclude Evidence Code section 940 corresponds exactly with its counterpart in the state Constitution, the People ask this court to hold that Prop. 8 still requires the *Harris,* rather than *Disbrow,* rule be used. Their argument is two-fold: First, special constitutional provisions such as Prop. 8 are controlling over general ones. Second, more recent constitutional provisions, such as Prop. 8, control over earlier enactments.

Two fallacies exist in this two-pronged approach. If we assume that Prop. 8 is in fact a more specific constitutional provision than article I, section 15, we still look to its express terms: "Nothing in this section shall affect any existing statutory rule of evidence relating to privilege . . . ." (Art. I, § 28, subd. (d).) " 'Statute' includes a treaty and a constitutional provision." (Evid. Code, § 230.) The words used are not ambiguous.

As for the second fallacy, we point out the obvious: A more recent enactment may control, but only if it addresses the same subject matter as the earlier one. As previously stated, Prop. 8 does not purport to address the rules of privilege, constitutional or evidentiary.

█ Finally, the *Jacobs* court rejected this argument as well: "Repeals by implication of constitutional and statutory provisions are disfavored. (See *In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610]; *Winchester* v. *Mabury* (1898) 122 Cal. 522, 527 [55 P. 393]; *State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 823 [164 Cal.Rptr. 739].) They are recognized only when two potentially conflicting laws cannot be harmonized. (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].) A repeal by implication is particularly disfavored where the provision in question is a basic, long-standing constitutional right such as the privilege against self-incrimination.

 "Nothing in the report of the legislative analyst or the arguments in favor of Proposition 8 of June 1982 printed in the voters' pamphlet indicates an intent to repeal any portion of Evidence Code section 940 or California Constitution, article I, section 15, or even to abrogate the judicial interpretation those provisions have received." (*Jacobs, supra,* 158 Cal.App.3d at p. 751.)

After the briefs were filed in this appeal, the case of *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], was decided. It held that Prop. 8 did not nullify the law providing for use immunities in juvenile matters because the constitutional provision expressly provides that it does not affect existing statutory rules of evidence relating to privileges. Because of existing judicial interpretation of Evidence Code section 940, this aspect of the privilege against self-incrimination was preserved. We particularly note the court's conclusion that statements made to a probation officer are included within the privilege even though they are not testimonial when made: "It is true that section 940 does not on its face refer to use immunities. However, the language of that provision is purposefully broad, and is meant to include within its reach judicial decisions relating to the privilege against self-incrimination." (*Id.,* at p. 808.) Although we are not concerned with use immunities, we conclude that it is not at all precedent setting to find that the trial court in the present case erred when it allowed the admissions of defendant to be used for impeachment purposes. The opinions in *Jacobs* and *Ramona R.* make that conclusion obvious.

We then turn to the effect of the error. In this instance, a quote from the Supreme Court aptly directs our single course of action: "It is unnecessary to determine whether the statements were full confessions or mere admissions. Even if it is assumed that they were admissions subject to the *Chapman* test of prejudice (*Chapman* v. *California* (1967) 386 U.S. 18, 22-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]) rather than confessions subject to the per se test of prejudice (see generally *People* v. *Powell* (1967) 67 Cal.2d 32, 51-52 [59 Cal.Rptr. 817, 429 P.2d 137]), the error in admitting . . . statements . . . was prejudicial. (Cf. *People* v. *McPherson* (1970) 2 Cal.3d 109, 115 [84 Cal.Rptr. 129, 465 P.2d 17].) The judgment must be reversed unless the prosecution shows beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman* v. *California, supra,* 386 U.S. 18; *People* v. *McClary, supra,* 20 Cal.3d [218] at p. 230 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Spencer* (1967) 66 Cal.2d 158, 168 [57 Cal.Rptr. 163, 424 P.2d 715].)" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 844 [183 Cal.Rptr. 817, 647 P.2d 93].)

We have previously noted the emphasis the prosecuting attorney placed on defendant's statements. Although the evidence is very strong that a ho-

micide was committed, we cannot conclude beyond a reasonable doubt the same high level of homicide would have been found by the jury if the statements had been excluded.

Because this case may be retried, we call attention to the other issues raised on this appeal. While we do not discuss these issues, we assume trial counsel and the court will read the briefs of appellate counsel for studied analysis of problems which may arise during further trial.

The judgment is reversed.

Hanson (P. D.), Acting P. J., and Vander Wall, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied August 1, 1985. Lucas, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.