[Crim. No. 13861. Third Dist. Mar. 7, 1986.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER JAMES AZURE, Defendant and Appellant.

**COUNSEL**

Patricia A. Bowman, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert D. Marshall and Michael T. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CARR, J.**—A jury convicted defendant of four counts of lewd and lascivious acts upon a child under the age of 14. (Pen. Code, § 288, subd. (a).)

Defendant appeals, contending (1) his statements to the police were involuntary and should have been excluded from evidence as the product of coercive police interrogation, (2) the victims of the molestations were not credible witnesses, resulting in a verdict unsupported by sufficient evidence, (3) the trial court erred in refusing to admit evidence of the victims' prior sexual knowledge; and (4) the trial court erred in denying defendant's motion for a new trial. We have listened to the four-hour tape recording of defendant's interrogation and conclude defendant's first contention is meritorious. ▮▮ ▮▮ ▮▮ ▮▮ ▮ On that basis, we shall reverse the judgment.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The following facts are taken from the police interrogation tapes and testimony at trial.

On March 20, 1983, Officer Virgil Lowe brought defendant to the Stockton Police Department for questioning. The interrogation began at 11:40 a.m. Lowe informed defendant he was a possible suspect in a child molestation investigation and read defendant his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Lowe then said defendant's step-grandchildren, Christie, Stephanie, and Dawn,[3] had reported a number of incidents of sexual abuse committed by defendant.

Defendant immediately denied the allegations and stated he believed the girls' mother, Karen B., was influencing the girls to tell these stories in order to end the relationship between defendant and Karen's mother. As

---

[1]The other issues raised by defendant are meritless. Very briefly: (1) As to the insufficient evidence argument, there were discrepancies in the girls' stories; these, however, were pointed out and argued to the jury; their testimony cannot be characterized as inherently incredible. The medical testimony was less than conclusive, but was consistent with the acts of molestation described by the girls. (2) Evidence of the girls' prior sexual knowledge and conduct *was* adduced at trial; the tape recording was played in which defendant described some of these events and, as well, defendant testified to these. The court precluded some questioning on the basis of Evidence Code section 352 and the failure to lay a proper foundation. Defendant did not recall the witness to correct this situation. (3) The motion for new trial was based on the same arguments raised here. If they are meritless here, there was, of course, no error in denying the motion.

[2]The only facts germane to this appeal are those surrounding defendant's interrogation by the police. Facts concerning the underlying offenses will be discussed only insofar as they are relevant to the confession issue.

[3]We have used the phrase "step-grandchildren" for convenience. Defendant lived with the girls' grandmother and the girls called him "grandpa." Christie, Stephanie and Dawn lived with their grandmother and defendant for several months in 1982-1983, when the incidents underlying this appeal were said to have occurred. At that time, their ages were nine, seven and four, respectively.

Lowe gave more details of the reported incidents, defendant continued to deny his participation, saying he was trying to figure out what the girls were talking about and why they would say these things. In recounting the girls' version of events Lowe accurately repeated some of their statements and fabricated others. Defendant told Lowe that Christie and Stephanie had previously been victims of a sexual molestation. He also described incidents of sexual conduct by the girls, such as masturbation and grabbing and slapping at defendant's penis. Lowe asked defendant if he thought the girls were lying. Defendant said he did not think the girls were lying, but he had no recollection of any of these events.

Lowe told defendant that in order for defendant to receive help with his problem, he first had to admit he had a problem. Lowe added that he wanted the truth: if the events did not happen and the children were lying, he wanted to know why the girls would make up such a story. Defendant repeated that nothing happened, that he could not remember any incidents.

After approximately one and one-half hours of questioning, defendant continued to maintain he could not remember ever having molested the girls. He did not directly repudiate the alleged statements of his stepgranddaughters, but stated if the girls reported these incidents, they might have happened although he could not remember any such occurrences.

Raising his voice in apparent frustration, Lowe then told defendant, "You *have* to remember. You've *got* to remember because . . . *we're not leaving here until you remember all this stuff.* . . . It had to have happened. Now I want to know from you when it happened and what were the circumstances." (Italics added.)

Questioning continued. After another one-half hour, defendant was still saying he was trying to figure out when these acts could have occurred. Lowe told defendant that he had to remember, that he knew defendant did it and he wanted the truth. Lowe repeated that he knew the girls were telling the truth and that if defendant would also be truthful he could get help. He added that it was impossible for defendant to have had intercourse with Christie, ejaculated and not remember having done so.

As the afternoon progressed and the questioning and prompting went on, defendant finally said that while lying with Christie on the living room floor, Christie might have "played with" defendant's penis and his penis might have slipped into her vagina. Defendant said, "that could have been what happened; put it down that way if you want to." He said another time, when he was lying down with the girls on the floor, Christie put defendant's penis

between her legs, but that he got up and no penetration occurred. Neither of these events had been described by Christie.

Defendant denied ever having molested the girls in their bedroom or committing any other acts. Lowe responded that there must have been more times and that defendant was not admitting everything. Defendant again said he did not want to call the children liars and that the events had to have happened but he did not remember ever ejaculating or "french-kissing" the girls. He said he was physically unable to get an erection and that the only possible time something could have happened was the incident on the living room floor.

Lowe again said he believed the girls and that there had to be more times when penetration occurred. Defendant continued to deny it. Lowe said defendant's statements were "not good enough to call it a day" and that the various versions he had received from the girls and defendant did not add up. He told defendant to "quit beating around the bush and tell me what happened."

Defendant again said the penetration could have happened the one time when Christie was lying with defendant on the living room floor with her leg over defendant. He categorically denied any incidents with Stephanie or Dawn.

The interview concluded at 3:35 p.m. Defendant was placed under arrest and charged with five counts of lewd and lascivious conduct with a child under the age of 14.

Before trial, defendant moved to suppress the tapes of the interrogation and defendant's statements as the product of coercive questioning. After listening to the tapes, the testimony of the interrogating officer and argument, the trial court denied defendant's motion.

During his testimony at the suppression hearing, the officer stated the interview lasted about four hours; that he had told defendant "we're not going to leave, meaning both of us" until defendant remembered the molestation incidents; that he said to defendant there was no way he (defendant) could get any help unless he admitted molesting the girls; that he (the officer) wanted to know now about the molestation because if he found out later it would cause defendant more problems; and that "we're not leaving" here until you remember all this stuff. Defendant did not testify at the suppression hearing but at trial he testified he felt the officer would not let him leave until he admitted molesting his step-granddaughters and that was the reason for his incriminating statements. The trial court did not indicate whether it

found the confession voluntary under the beyond a reasonable doubt standard (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 608 [147 Cal.Rptr. 172, 580 P.2d 672]) or under the federal standard of preponderance of evidence. (*Lego* v. *Twomey* (1972) 404 U.S. 477 [30 L.Ed.2d 618, 92 S.Ct. 619].)

The tapes were subsequently played to the jury during the trial and defendant was convicted on four of the five counts.[4]

## DISCUSSION

◼◼◼ The privilege against self-incrimination protects a defendant against the use of his confession by the prosecution unless the confession is shown to be the product of a rational intellect and a free will. (*People* v. *Jimenez*, *supra*, 21 Cal.3d 595, 605.) "In determining whether or not an accused's will was overborne, an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041].) The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were 'such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' (*Rogers* v. *Richmond* (1961) 365 U.S. 534, 544 [5 L.Ed.2d 760, 768, 81 S.Ct. 735].) Statements which are 'the product of coercion, either physical or psychological, cannot stand . . . because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth.' (*Id.*, at pp. 540-541 [5 L.Ed.2d at p. 766].) Also, coerced confessions are of doubtful reliability. (*People* v. *Garner* (1961) 57 Cal.2d 135, 163 [18 Cal.Rptr. 40, 367 P.2d 680] (conc. opn. of Traynor, J.).)" (*People* v. *Hogan* (1982) 31 Cal.3d 815, 841 [183 Cal.Rptr. 817, 647 P.2d 93].)

◼◼◼ Before passage of Proposition 8 the burden of proof borne by the prosecution as to the voluntariness of a confession was beyond a reasonable doubt. (*People* v. *Jimenez*, *supra*, 21 Cal.3d at p. 608.) In *Jimenez*, *supra*, the Supreme Court adopted the reasonable doubt standard as a judicially declared rule of criminal procedure and determined it was unnecessary to determine if this standard was also constitutionally compelled. (21 Cal.3d at p. 605.) The People assert enactment of the "Truth-in-Evidence" pro-

---

[4]The trial court declared a mistrial on count V, the charge relating to Dawn, after the jury was unable to reach a verdict on that count.

vision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))[5] abrogates the rule established in *Jimenez,* and requires the prosecution to prove voluntariness only by the federal standard of preponderance of the evidence as enunciated in *Lego* v. *Twomey, supra,* 404 U.S. 477, 489 [30 L.Ed.2d 618, 627]. We disagree.

In *People* v. *Weaver* (1985) 39 Cal.3d 654 [217 Cal.Rptr. 245, 703 P.2d 1129], the Supreme Court observed: "Although article I, section 28, subdivision (d), of the state Constitution, by its terms forbids the exclusion of relevant evidence in any criminal proceeding, the provision further states that 'Nothing in this section shall affect any existing statutory rule of evidence relating to privilege . . . .' " (P. 659.) Evidence Code section 940 is such a statutory privilege and provides: "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." (See *Ramona R.* v. *Superior Court* (1985) 37 Cal.3d 802, 808.)

The People assert Evidence Code section 940 is applicable only to testimonial privileges and is irrelevant to extrajudicial statements as defendant's confession in the present case. This argument was rejected in *People* v. *Barrios* (1985) 166 Cal.App.3d 732, 736-742 [212 Cal.Rptr. 644] [rev. den. Aug. 1, 1985]. We find the analysis of *Barrios* persuasive and reject the People's contention. Indeed, in *People* v. *Clark* (1985) 171 Cal.App.3d 889 [217 Cal.Rptr. 819], this court held Evidence Code section 940 applicable to an extrajudicial statement. (At p. 894.)

Evidence Code section 940 includes within its parameters existing judicial decisions relating to its statutory privilege. "[T]he language of [section 940] is purposefully broad, and is meant to include within its reach judicial decisions relating to the privilege against self-incrimination." (*Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at p. 808, see also *People* v. *Navarez* (1985) 169 Cal.App.3d 936, 942-945 [215 Cal.Rptr. 519]; *People* v. *Barrios, supra,* 166 Cal.App.3d at pp. 742-743, *People* v. *Jacobs* (1984) 158 Cal.App.3d 740, 750-751 [204 Cal.Rptr. 849].)

In *People* v. *Weaver, supra,* 39 Cal.3d 654, our Supreme Court was presented with a question analogous to that in the instant case, whether the

---

[5]Article I, section 28, subdivision (d) of the California Constitution provides in full that: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

limited exclusionary rule enunciated in *People* v. *Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024] survived the enactment of Proposition 8. In *Coleman,* the court held a probationer's testimony at a probation revocation hearing could not be used against him in a subsequent trial on the related criminal charges, except for impeachment on rebuttal. (*People* v. *Coleman, supra,* 13 Cal.3d at p. 889.) Like the *Jimenez* court, the *Coleman* court adopted this position as a rule of criminal procedure without reaching the constitutional question. (*Ibid.*) The court found this rule compelled by "the policy of maintaining ' "a fair state-individual balance" ' at the subsequent criminal trial ' "by requiring the government . . . in its contest with the individual to shoulder the entire load." ' [Citation.] Together with the demands of due process that an accused be presumed innocent and that his guilt be established beyond a reasonable doubt [citations], the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt *before* he must decide whether to remain silent or to testify in his own behalf. [Citations.]" (*People* v. *Coleman, supra,* 13 Cal.3d at pp. 875-876, original italics.) The rule also reflected the law's " 'unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt.' " (*Id.,* at p. 878, quoting *Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].)

In *Weaver, supra,* the court held this judicially created rule survived the enactment of Proposition 8. As Justice Lucas explained in the majority opinion, "*Coleman*'s exclusionary rule *may be deemed a 'statutory' rule because the self-incrimination statute itself (Evid. Code, § 940) merely adopts existing judicial decisions relating to the privilege.* [Citation.]" (39 Cal.3d at p. 659, italics added.)

The *Weaver* holding is relevant to the present issue. The rule set forth in *Jimenez,* as that in *Coleman,* is judicially created. Both rules are formulated to sustain the public policy considerations underlying the privilege against self-incrimination. (See *People* v. *Jimenez, supra,* 21 Cal.3d at pp. 605-606.) We conclude the *Jimenez* rule, as the *Coleman* rule, is a " 'statutory rule of evidence relating to privilege' " within the meaning of article I, section 28, subdivision (d) of the state Constitution. (*People* v. *Weaver, supra,* 39 Cal.3d at p. 659.) The rule is therefore expressly exempted from the effects of Proposition 8 by the proposition's own terms. (Cal. Const., art. I, § 28, subd. (d)), and defendant's confession is inadmissible unless the People prove beyond a reasonable doubt that it is voluntary. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 605.)[6]

---

[6]In the recent case of *People* v. *Leach* (1985) 41 Cal.3d 92 [221 Cal.Rptr. 826, 710 P.2d 893], the court held the prosecution was not held to the beyond a reasonable doubt standard

■ The trial court did not articulate the standard it was applying in its ruling that defendant's confession was admissible. Because of the uncertain state of the law after passage of Proposition 8, we cannot presume the court found defendant's confession to be voluntary beyond a reasonable doubt. (See *People* v. *Jimenez, supra,* 21 Cal.3d at p. 609.) From the record herein, though admittedly this is a close case, we conclude defendant's confession was involuntary as a matter of law, compelling reversal.

The People contend several factors support a finding of voluntariness. (See *People* v. *Andersen* (1980) 101 Cal.App.3d 563, 577-578 [161 Cal.Rptr. 707].) Lowe read defendant his *Miranda* warnings and reiterated at the beginning of the interview that defendant was free to refuse to answer questions at any time. Defendant never exercised that right. Lowe offered defendant the opportunity to get food or go to the restroom and in fact took two short breaks and paused to change the tapes. Defendant smoked Lowe's cigarettes throughout the interview.

The fact defendant was given *Miranda* warnings and made physically comfortable does not excuse other coercive aspects of the interrogation. Lowe consistently lied to defendant about what the girls had told him. Defendant was taken from his home by Lowe to the police station and into the interrogation room. He repeatedly implied that things would be easier on defendant if he admitted his guilt, saying defendant could receive help for his problem only if he admitted doing these acts, and conversely, that things would be harder on defendant if he waited to confess.

■ The use of deception or subterfuge will not render a confession inadmissible unless it is of a type likely to produce an untrue statement. (*In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129], *People* v. *Watkins* (1970) 6 Cal.App.3d 119, 125 [85 Cal.Rptr. 621].) ■ Lowe's statements to defendant, standing alone, may not rise to this level. Defendant's claim is not just that the police used subterfuge, but that he was psychologically coerced into making incriminating statements and admissions, with deception being one of the tactics used to overcome his free will. (See *People* v. *Hogan* (1982) 31 Cal.3d 815, 840 [183 Cal.Rptr. 817, 647 P.2d 93].) Examining the totality of the circumstances, we agree.

The interrogation session lasted four hours. Defendant consistently denied the accusations made against him, saying he could not recall ever having done anything to his step-granddaughters. Lowe was not content with this response and continued to question defendant until he admitted some acts,

---

of proof when the statement at issue was not that of the defendants. In its discussion the court distinguished the two situations, analyzing a defendant's position with references to *Jimenez.*

but not the acts which Lowe stated in his police report had been reported by the girls.

This questioning was far more than a simple exhortation to tell the truth. (See *People* v. *Hogan, supra,* 31 Cal.3d at p. 839.) Lowe repeatedly said he did not believe defendant could not remember these events, at one point telling defendant, "You *have* to remember. You've *got* to remember because . . . we're not leaving here until you remember all this stuff." While Lowe said he was only after the truth, he stated the truth was the girls' version of events.

In the first hour of interrogation, Lowe said, "If you're telling me that [the girls] are lying, then that's when I have to kind of sit back and take exception to that. . . ." The following three hours of questioning repeated the same theme, with such statements as "[Stephanie] tells me that you did it, so I know that you did" and "I believe [the girls]. I want you to tell me when you did that." For hours defendant repeatedly said he did not remember any of the events described by Lowe. Lowe refused to accept this response, insisting defendant remember the incidents. The very real impression conveyed throughout the four-hour interrogation was that defendant was not free to leave until he admitted molesting his step-granddaughters. It is this type of questioning that is an anathema to our system of criminal justice and cannot be tolerated. Defendant was deprived of his free choice to admit, deny, or refuse to answer Lowe's questions. (*Garrity* v. *New Jersey* (1967) 385 U.S. 493, 496 [17 L.Ed.2d 562, 565, 87 S.Ct. 616].) It was not the product of a rational intellect and free will.

██ Error in the admission of a confession "is prejudicial per se and compels reversal. (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 576 [75 Cal.Rptr. 642, 451 P.2d 74]; *People* v. *Fioritto* (1968) 68 Cal.2d 714, 720 [68 Cal.Rptr. 817, 441 P.2d 625].) This is true whether the conviction is founded in whole or in part upon the confession, whether the confession is true or false, and even if there is clearly sufficient evidence other than the confession upon which to sustain the conviction. (*Jackson* v. *Denno* (1964) 378 U.S. 368, 376 [12 L.Ed.2d 908, 915 84 S.Ct. 1774, 1 A.L.R.3d 1205].)" (*People* v. *Watkins, supra,* 6 Cal.App.3d at p. 122.)

## DISPOSITION

The judgment is reversed.

**SIMS, J.**—██ ██ ██ ██ I concur in nearly all aspects of Justice Carr's opinion. I write only to add my view that the rule of *People* v.

*Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], requiring the People to prove the voluntariness of a confession beyond a reasonable doubt, is required by article I, section 15 of the California Constitution.[1]

For reasons stated in Justice Carr's opinion, I agree that the privilege contained in Evidence Code section 940 survives enactment of Proposition 8 and applies to extrajudicial statements.

Evidence Code section 940 provides that *"To the extent that such privilege exists under the Constitution of* the United States or *the State of California,* a person has a privilege to refuse to disclose any matter that may tend to incriminate him."* (Italics added; see *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 808 [210 Cal.Rptr. 204, 693 P.2d 789].)

The crucial question, then, is whether the *Jimenez* rule is required by the state constitutional privilege so that the rule exists "under . . . the Constitution of . . . the State of California." (Evid. Code, § 940.) In *Jimenez,* our Supreme Court held the reasonable doubt standard is required in California as a judicially declared rule of criminal procedure. (P. 605.) The court found it unnecessary to determine whether article I, section 15 of the state Constitution compels application of that standard in order to protect the important values embodied therein. (*Ibid.*) However, in my view, recent cases of our Supreme Court leave no doubt that the *Jimenez* rule is of constitutional origin. The handwriting on the wall is written too large.

In *Ramona R. v. Superior Court, supra,* our Supreme Court recently resolved a closely analogous question: whether, following Proposition 8, the People were still precluded from using at trial statements made by the minor at a prior fitness hearing. (37 Cal.3d at p. 804.) In arriving at the conclusion the People were precluded, the court placed crucial reliance on *People v. Coleman* (1975) 13 Cal.3d 867 [120 Cal.Rptr. 384, 533 P.2d 1024], where the court had, as in *Jimenez,* adopted a judicially declared rule prohibiting use at trial of a defendant's statements made at a prior probation revocation proceeding. (*Ramona R., supra,* 37 Cal.3d at pp. 809-810.) The *Ramona R.* court held the policies underlying *Coleman* demonstrated that, even though the *Coleman* rule had not been based on the state Constitution when promulgated, "because we deemed such a determination to be unnecessary" (*id.,* at p. 809), the rule was of constitutional origin. (*Ibid.*) Recently, in *People v. Weaver* (1985) 39 Cal.3d 654 [217 Cal.Rptr. 245, 703 P.2d 1139], the court held that the *Coleman* rule itself survived Proposition 8. (P. 660.)

---

[1]Article I, section 15 provides in pertinent part: "Persons may not . . . be compelled in a criminal cause to be a witness against themselves . . . ."

Since the policies underlying the *Coleman* rule and the *Jimenez* rule are nearly identical, there is no persuasive reason to deny that *Jimenez*'s true parentage is found in the California Constitution.

Thus, the *Coleman* rule was adopted in part to vindicate the policy of "maintaining '"a fair state-individual balance"'" at the subsequent criminal trial '"by requiring the government . . . in its contest with the individual to shoulder the entire load."'" [Citations.] Together with the demands of due process that an accused be presumed innocent and that his guilt be established beyond a reasonable doubt [citations], the privilege against self-incrimination requires the prosecution in a criminal trial to produce sufficient evidence to establish the defendant's guilt *before* he must decide whether to remain silent or to testify in his own behalf. [Citations.]" (*People* v. *Coleman, supra,* 13 Cal.3d at p. 875, italics in original.) The rule also reflected the law's "'unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt.'" (*Id.,* at p. 878, quoting *Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].)

In *Jimenez,* as in *Coleman,* our high court emphasized the central place of the privilege against self-incrimination in our system of jurisprudence. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 605-606.) The court noted that the privilege "reflects many of the fundamental values and most noble aspirations of our society, including: 'our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminatory statements will be elicited by inhumane treatment and abuses; . . . our respect for the inviolability of the human personality . . .; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes a "shelter to the guilty," is often "a protection to the innocent." *Quinn* v. *United States,* 349 U.S. 155, 162.' (*Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [12 L.Ed.2d 678, 681, 84 S.Ct. 1594].)" (*Id.,* at p. 605.) The court took notice of special safeguards which have been designed to preserve the right, including the rule that automatically reverses a conviction when an involuntary confession has been used, even though there is ample evidence aside from the confession to support the conviction. (*Ibid.*)

Thus, the reliance of both *Coleman* and *Jimenez* on the same line of judicial authority (see, e.g., *Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 55 [12 L.Ed.2d at pp. 681-682]; *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068]) demonstrates that both cases are grounded upon closely allied policy considerations.

*Ramona R.* tells us that these policy considerations are of constitutional magnitude in the context of a defendant's former testimony. It would be wholly illogical to conclude that these policies are of less significance in the context of involuntary confessions.

Consequently, in my view, the *Jimenez* rule survives the enactment of the "truth-in-evidence" provision of Proposition 8 for precisely the same reason the *Coleman* rule survives: because it implements crucial policies which have already been recognized as being of constitutional dimension. (*People v. Weaver, supra,* 37 Cal.3d at p. 659; *Ramona R.* v. *Superior Court, supra,* 37 Cal.3d at p. 809-811.)

**EVANS, Acting P. J.**—I dissent.

I have independently listened to the four-hour tape recording, which resulted in some incriminating admissions by the defendant, to determine whether those admissions were voluntarily made. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) I conclude as did the trial judge that the four-hour interview was not a coercive interrogation but rather a dialogue between defendant and Officer Virgil Lowe of the Stockton Police Department in which Officer Lowe skillfully interrogated and commented on the realities of the molestation allegations made against the defendant by his three step-grandchildren. A careful review of the tapes fails to indicate to me any physical or mental coercion which precipitated the defendant's incriminating statements. I reach this conclusion readily and beyond any question of doubt, regardless of the standard of review to be applied. The courtesy and politeness of the officer during the interrogation was exemplary. The manner in which he presented the evidence against the defendant compared favorably to that of skilled trial counsel in examination of a witness in court. Neither in tone nor tempo of the questions tendered or statements made does oppressive pressure appear. The conduct of the interview was anything but coercive. At most, the tapes disclose in various form repeated admonitions by the officer to the defendant to tell the truth. Intellectual persuasion is not the equivalent of coercion. (*People* v. *Hill* (1967) 66 Cal.2d 536, 548-549 [58 Cal.Rptr. 340, 426 P.2d 908].) As stated in *People* v. *Ditson* (1962) 57 Cal.2d 415, 433 [20 Cal.Rptr. 165, 369 P.2d 714], "We do find searching questions and exhortations to help himself by revealing the acts of others. But absent something other than mere questions, or exhortations to tell the truth or clear his conscience or help himself by revealing facts as to the [molestation allegation] . . . there appears to be nothing on the face of the record which would support a finding of overreaching or coercion."

Viewing the interview in its worst light reveals only questioning which at times could be described at most to have been devious or tricky; however,

such conduct by an interrogator has not been found to be the basis of rendering a defendant's statement inadmissible. (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 520 [30 Cal.Rptr. 538, 381 P.2d 394].)

The question to be answered is whether the behavior of the law enforcement officer was such as to overbear the defendant's will to resist. In my view, the contents of the tape recordings overwhelmingly compel a negative answer to that question. For four hours, the defendant steadfastly maintained a position of innocence and denial of any lewd conduct with either Dawn or Stephanie. The questioning produced admissions of two incidents with the older stepgranddaughter Christie. His steadfast denials of all other incidents which had been alluded to by the officer does not reveal a breakdown of the defendant's will to resist. I would conclude that the limited confession made by defendant was freely and voluntarily made beyond any reasonable doubt.

I also disagree with the majority conclusion that the "beyond a reasonable doubt" rule of *People* v. *Jimenez, supra,* 21 Cal.3d at page 608, has somehow been transformed to a statutory rule and therefore survives the provisions of article I, section 28, subdivision (d) (Truth-in-Evidence), of the California Constitution. The privilege against self-incrimination is guaranteed by the federal and California Constitutions; the standard by which the voluntariness of incriminating statements is determined is not established by either Constitution or statutory provisions. This is made clear by the California Supreme Court decision in *People* v. *Jimenez, supra,* 21 Cal.3d 595. The court stated in overruling all prior California decisions applying the preponderating standard, "that the reasonable doubt standard is required as a *judicially declared rule of criminal procedure.*" (Italics added; *id.,* at p. 605.)

Now by some judicial legerdemain, the court in *People* v. *Barrios* (1985) 166 Cal.App.3d 732, 736-742 [212 Cal.Rptr. 644], and the majority in this case seek to abrogate part of the effect of article I, section 28, subdivision (d), and somehow insinuate the provisions of Evidence Code section 940 into the review of extrajudicial statements made by a defendant. I find such a conclusion to be a legally indefensible effort to avoid the obvious effect of the constitutional amendment adopted by the people which adopted the federal standard of a preponderance of evidence to find whether or not a confession was produced by coercion and was voluntary as established in *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619].

I find the defendant's remaining contentions to be utterly meritless. I would affirm the judgment.

Respondent's petition for review by the Supreme Court was denied May 22, 1986. Lucas, J., and Panelli, J., were of the opinion that the petition should be granted.